# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

In re:                                        **CASE NO. 6:10-bk-20709-KSJ**

**TEMPUS RESORTS
INTERNATIONAL, LTD., et al.,**                **CHAPTER 11**

**Jointly Administered with Case Nos.
6:10-bk-20712-KSJ, 6:10-bk-20714-KSJ,
6:10-bk-20715-KSJ, 6:10-bk-20716-KSJ,**
Debtors.          **6:10-bk-20717-KSJ, 6:10-bk-20718-KSJ,
6:10-bk-20719-KSJ, 6:10-bk-20720-KSJ**

**<u>EMERGENCY RELIEF REQUESTED
ON OR BEFORE TUESDAY,
NOVEMBER 23, 2010</u>**

_____/

## <u>DEBTORS' EMERGENCY MOTION
FOR AUTHORITY TO OBTAIN CREDIT AND INCUR DEBT</u>

### AND

## <u>CERTIFICATE OF NECESSITY
OF REQUEST FOR EMERGENCY INTERIM HEARING</u>

**TEMPUS RESORTS INTERNATIONAL, LTD.**, a Florida limited partnership

("Tempus"), and its affiliates as debtors and debtors- in- possession, hereby requests authority to

obtain credit, incur debt, and grant liens pursuant to section 364(c) of the Bankruptcy Code

("Motion"), and in support thereof states as follows:

### I.  <u>Background</u>

1.      On November 19, 2010 ( the "Petition Date"), Tempus and eight (8) affiliated co-

debtors (collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title

11 of the United States Code ("Bankruptcy Code"); no trustee has been appointed.

2. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. § 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

3. The Debtors continue to manage their property and operate their business as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4. The Debtors have been in the timeshare industry in Central Florida for over twelve (12) years. Since 1998, the Debtors have engaged in the development, marketing, sale and management of its flagship resort, Mystic Dunes Resort and Golf Club ("Mystic Dunes"), a 717 unit timeshare and golf resort located on approximately 600 acres in Celebration, Florida.

5. In 2008, the Debtors acquired and established a timeshare plan in twenty (20) units in Dunes Village Resort ("Dunes Village"), a larger condominium hotel project located Myrtle Beach, South Carolina (collectively, Mystic Dunes and Dunes Village are collectively hereinafter referred to as the "Resorts"). As part of the Dunes Village acquisition, the Debtors also acquired the original developer's remaining inventory in a pre-existing three unit fractional plan.

6. Through its management arm, Tempus Resorts Management, Ltd., a Florida limited partnership ("Tempus Management"), the Debtors manage Mystic Dunes and the timeshare and fractional plans at Dunes Village (although all on-site management functions at Dunes Village have been subcontracted to an unaffiliated on-site management company).

7. Tempus Management has the exclusive right to manage the Resorts by virtue of contracts between Tempus Management and the respective Resort homeowners associations ("Associations"). In connection with its management duties, Tempus Management provides on-site employees to manage Mystic Dunes' day to day operations. Tempus provides employees to administer the Associations and operate the Resorts' reservation systems.

8. Through its golf company, Tempus Golf Development, LLC, a Delaware limited liability company, Debtors own and operate a par 71 championship caliber golf course at Mystic Dunes.

9. Mystic Dunes consists of a mix of 717 one, two and three bedroom units. The timeshare plan at Dunes Village consists of a mix of 20 studio, one, two, three and four bedroom units. The fractional plan at Dunes Village consists of a studio, a two and a three bedroom unit. The timeshare plans at Mystic Dunes and Dunes Village are comprised of one week intervals (or biennial week intervals for every other year usage). The fractional plan at Dunes Village is comprised of 1/8 intervals. Each of the Resorts has recreational facilities such as various pool features, playgrounds, sport courts, restaurants and other amenities.

10. The Debtors have an immediate and critical need to borrow funds for working capital shortfalls (the "DIP Facility") to allow continued limited operation of its business and preservation of the enterprise value of the Debtors' business and assets as the Debtors bridge toward confirmation of a chapter 11 plan of reorganization.

11. The Debtors' largest prepetition lender, Resort Finance America LLC ("RFA") and the Debtors were unable to agree upon financing terms. Additionally, RFA does not consent to the Debtors obtaining post-petition financing secured by priming liens on all of the Debtors' assets.

12. Accordingly, the Debtors have negotiated and are prepared to execute that certain Post-Petition Term Credit and Security Agreement (the "DIP Credit Agreement") by and among the Debtors and Tempus Acquisition, LLC ("Acquisition" or the "Post-Petition Lender"), a copy of which will be filed under separate notice of filing. The Debtors have also negotiated and are hereby seeking entry of that certain Interim Order Authorizing Debtors to Obtain Post-Petition Financing Pursuant to Section 363 and 364 of the Bankruptcy Code, Granting Adequate

Protection, and Granting Liens, Security Interest and Superpriority Claims (the "Interim Financing Order"), a copy of which is attached hereto as Exhibit A. The Debtors also seek entry of a final financing order substantially on the terms of the Interim Financing Order but on a final basis and after a final hearing.

13.     By the Interim Financing Order, the Debtors seek authority to enter into the DIP Credit Agreement and obtain post-petition, secured financing from Acquisition that includes, among others, the following terms:

(a.)     Borrowers:  All of the Debtors.

(b.)     Lenders:  Tempus Acquisition, LLC

(c.)     Commitment:  $6,500,000 term facility, subject to the budget attached hereto as Exhibit B (the "Budget").

(d.)     Use of Proceeds:   To provide working capital for general corporate purposes in accordance with the Budget.

(e.)     Maturity Date:    The earliest of (i) February 18, 2011; (ii) the consummation of the sale of substantially all of the Debtors' assets pursuant to the approved plan; (iii) the effective date of any plan of reorganization; (iv) the conversion of any of these cases ones under chapter 7 of the Bankruptcy Code; (v) the appointment of a chapter 11 trustee; or (f) dismissal of any of these chapter 11 cases.

(f.)     Security and Priority:  As security for all loans, advances, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtors to the Post-Petition Lender hereunder (all such loans, advances, indebtedness or obligations are the "Post-Petition Loans"), the Post-Petition Lender is hereby granted valid, binding, enforceable, and perfected security interests in and liens (the "Post-Petition Liens") in and to all currently owned or hereafter acquired property and assets of each of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts, accounts receivable, inventory, chattel paper, instruments, documents, letter of credit rights, cash-in-advance deposits, general intangibles, contracts, patents, deposit accounts, real estate, fixtures, machinery, securities, investment property, financial assets, software, equipment, vehicles, trademarks, trade names, licenses, litigation proceeds (including any causes of action or any proceeds of any causes of action arising under sections 544, 547, 548, 550, or 551 of the Bankruptcy Code), rights to payment including tax refund claims, insurance

proceeds and tort claims and the proceeds, products, rents, and profits of all of the foregoing (all of the foregoing, the "Post-Petition Collateral"), which Post-Petition Liens in each case: (a) junior in priority only to Permitted Liens (as defined in the Prepetition Credit Agreement) that are valid, binding, enforceable, and perfected liens existing in the Prepetition Collateral on the Petition Date and that are not subject to avoidance or subordination pursuant to section 364(c)(3) of the Bankruptcy Code, and (b) senior and superior liens on all property of the Debtors' estates that is not otherwise subject to a security interest or lien, pursuant to section 364(c)(2) of the Bankruptcy Code. Except as expressly set forth in Interim Financing Order, the liens granted therein: (a) shall be subject to any Permitted Liens, but not to any other lien which is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code; and (b) shall not be subordinated to or made pari passu with any other lien under section 364(d) of the Bankruptcy Code or otherwise; and (c) shall be subject to the unpaid fees of the clerk of the Bankruptcy Court or District Court, as applicable, and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b). In addition, the Post-Petition Loans shall have priority in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), or 726 of the Bankruptcy Code ("Superpriority").

(g.) <u>Adequate Protection</u>. As adequate protection under section 364(d)(1)(B) of the Bankruptcy Code, RFA and Textron Financial Corporation, the Debtors' prepetition secured creditors, will be granted valid, binding, enforceable and perfected liens (the "Adequate Protection Liens") in all Post-Petition Collateral to secure an amount of Prepetition Indebtedness (the "Adequate Protection Obligations") equal to the sum of the aggregate amount of diminution in value of their respective Prepetition Collateral, if any, whether by depreciation, use, sale, loss, decline in market price, or otherwise resulting from Debtors' use of the Prepetition Lenders' cash collateral and the granting of the Post-Petition Liens. The Adequate Protection Liens will be subject only to: (i) the Post-Petition Liens; and (ii) any liens or security interests existing on or in the Post-Petition Collateral that are valid, binding, enforceable, and perfected liens on the Petition Date that are not otherwise subject to avoidance or subordination. For the avoidance of doubt, the Adequate Protection Liens granted to RFA and Textron shall attach only to those assets of the Debtors that would have constitute Prepetition Collateral of each respective Prepetition Lender

(h.) <u>Fees</u>: Closing fee of $160,000.

(i.) <u>Interest Rate</u>: 10% per annum.

(j.) <u>Default Interest Rate</u>: 12% per annum.

(k.) <u>Events of Default</u>: The following constitute events of default: (i) material non-compliance by any Debtors with any of the terms or provisions of the Budget or the Interim Financing Order; (ii) any default or event of default under the DIP Credit Agreement; (iii) the Debtors' failure to: (A) provide the Post-Petition

Lender with the Debtors' proposed Final Financing Order budget on or before November 30, 2010; (B) to procure entry of a Final Financing Order on or before December 10, 2010; (C) prepare and file an adversary proceeding against RFA to avoid and recover certain transfers of property of the Debtors made to RFA as preferences and fraudulent transfers under sections 547, 548, and 550 of the Bankruptcy Code on or before 5 business days from the Petition Date; (D) prepare and file a plan and disclosure statement (acceptable in form and substance to the Post-Petition Lender) with the Court on or before December 6, 2010, that will include, among other provisions, the sale of substantially all of the Debtors' assets; (E) obtain a final order, in the form and substance acceptable to the Post-Petition Lender, approving the Debtors' disclosure statement on or before January 7, 2011; (F) obtain a final order confirming the Debtors' plan (all of which shall be acceptable in form and substance to the Post-Petition Lender) on or before February 6, 2011; and (G) consummate any sale(s) contemplated by the plan and fully, finally, and indefeasibly satisfy the Post-Petition Loans as of February 18, 2011; and (iv) the occurrence of the Maturity Date (as defined above).

(l.) <u>Remedies Upon Default</u>: Three business days after the occurrence of a default under the Interim Financing Order, and after providing written notice to counsel for any Committee, the Office of the United States Trustee and counsel to other known holders of liens on the Prepetition Collateral, the Post-Petition Lender, shall have the right, to seek expedited relief from the automatic stay extant pursuant to section 362 of the Bankruptcy Code to exercise the rights granted them under the DIP Credit Agreement and the Interim Financing Order as to all or such part of the Collateral as the Post-Petition Lender in its sole discretion shall elect, including the right to take possession of and sell the Collateral in accordance with the terms of the Florida Uniform Commercial Code to satisfy the DIP Facility.

14. The DIP Credit Agreement and Interim Financing Order contain other terms, and the Debtors seek approval and entry of them in their entirety. The Debtors and Acquisition have negotiated the terms and conditions of the DIP Facility and the Interim Financing Order in good faith; the terms and conditions are fair and reasonable and are supported by reasonably equivalent value, and any credit extended by Acquisition pursuant to the terms of the DIP Credit Agreement and the Interim Financing Order will have been extended in "good faith", as that term is used in section 364(e) of the Bankruptcy Code.

## CERTIFICATE OF NECESSITY OF
## REQUEST FOR EMERGENCY INTERIM HEARING

15.     Operation of the Debtors' business requires the incurring of expenses on a daily basis, including resort operations and payroll.

16.     The Debtors do not have sufficient capital to meet those expenses if an emergency preliminary hearing is not granted, and the Debtors are not allowed to borrow funds from Acquisition. Customers, guests, vendors, and employees have been at risk since the Petition Date and will continue to be at risk until the Court grants authority to borrower under the DIP Facility.

17.     The Debtors estimate that approximately 30 minutes will be necessary for a hearing on this Motion and that a similar amount of time may be required for a final hearing.

18.     The Debtor and counsel are prepared to appear on two hours' notice at a hearing to demonstrate that the request for an emergency hearing is not the result of the Debtor's or counsel's procrastination or lack of attention.

**WHEREFORE**, the Debtors respectfully request the Court enter the Interim Financing Order and granting such further relief the Court deems necessary and proper.

**DATED:** November 19, 2010.

/s/Elizabeth A. Green
Elizabeth A. Green, Esq.
Florida Bar No.: 0600547
egreen@bakerlaw.com
Jimmy D. Parrish, Esq.
Florida Bar No.: 0526401
jparrish@bakerlaw.com
Tiffany D. Payne, Esq.
Florida Bar No.: 0421448
tpayne@bakerlaw.com
BAKER & HOSTETLER LLP
200 S. Orange Ave.
SunTrust Center, Suite 2300
P.O. Box 112 (32802-0112)
Orlando, Florida 32801-3432
Telephone: (407) 649-4000
Facsimile: (407) 841-0168

| | |
|---|---|
| **In re:** | **CASE NO. 6:10-bk-20709-KSJ** |
| **TEMPUS RESORTS** | |
| **INTERNATIONAL, LTD., et al.,** | **CHAPTER 11** |
| | **Jointly Administered with Case Nos.** |
| | **6:10-bk-20712-KSJ, 6:10-bk-20714-KSJ,** |
| | **6:10-bk-20715-KSJ, 6:10-bk-20716-KSJ,** |
| **Debtors.** | **6:10-bk-20717-KSJ, 6:10-bk-20718-KSJ,** |
| | **6:10-bk-20719-KSJ, 6:10-bk-20720-KSJ** |
| | **EMERGENCY RELIEF REQUESTED** |
| | **ON OR BEFORE TUESDAY,** |
| | **NOVEMBER 23, 2010** |

_____/

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the **DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO OBTAIN CREDIT AND INCUR DEBT AND CERTIFICATE OF NECESSITY OF REQUEST FOR EMERGENCY INTERIM HEARING,** together with all exhibits, has been furnished via electronic transmission, facsimile transmission and/or via U.S. Postage Prepaid Mail to the following: Roger Farwell, CEO, Tempus Resorts International, Ltd., 7380 Sand Lake Road, Suite 600, Orlando, FL 32819, Orlando, FL 32819; Resort Finance America, LLC, c/o Centerbridge Partners, LLC, 375 Park Avenue, 12th Floor, New York 10152; Andrew M. Brumby, Esq., Shutts & Bowen, LLP, P.O. Box 4956, Orlando, Florida 32802-4956 (a/f Resort Finance American, LLC); Lloyd A. Palans, Esq., Bryan Cave, LLP, One Metropolitan Square, 211 North Broadway, Suite 3600, St. Louis, Missouri 63102-2750 (a/f Resort Finance American, LLC); Textron Financial Corporation, c/o Steven Fox, Esq., Epstein, Becker & Green, 250 Park Ave., New York, NY 10177; William Lambert Trust, 1685 North Tropical Trail, Merrit Island, Florida 32953; William Lambert Trust, c/o Allen C.D. Scott, Scott Legal Associates, P.A., St. Augustine, Florida 32084; William R. and Lucille H. Lambert, 1685 North Tropical Trail, Merritt Island, FL 32953; the secured creditors and the largest twenty (20) unsecured creditors as shown on the matrices attached to the original motion filed with the court; and the U.S. Trustee, 135 West Central Boulevard, Suite 620, Orlando, FL 32801 on this __19th__ day of November, 2010.

/s/Elizabeth A. Green_____
Elizabeth A. Green, Esq.

**EXHIBIT "A"**

# UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-_____ |
| Tempus Resorts International, Ltd., et al. | ) | (Jointly Administered) |
| | ) | |
| | ) | Chapter 11 |
| | ) | |
| Debtors. | ) | |
| | ) | |
| | ) | |
| | ) | |

## INTERIM ORDER AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO SECTIONS 363 AND 364 OF THE BANKRUPTCY CODE, GRANTING ADEQUATE PROTECTION, AND GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

Upon the motion (the "Motion") of Tempus Resorts International, Ltd. and its above-captioned co-Debtors affiliates (collectively, the "Debtors", as Debtors and debtor-in-possession) for the entry of an order pursuant to sections 105, 361, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") authorizing it to: (i) obtain post-petition financing pursuant to sections 363 and 364 of the Bankruptcy Code from Tempus Acquisition, LLC., as lender (the "Post-Petition Lender"), subject to the terms and conditions set forth herein and that certain Post-Petition Loan and Security Agreement (the "Post-Petition Loan Agreement"); and (ii) grant mortgages, security interests, liens and claims to the Post-Petition Lender (including claims pursuant to section 364(c)(1) of the Bankruptcy Code, and liens pursuant to sections 364(c)(2) and (3) of the Bankruptcy Code) and other liens and superpriority claims as set forth herein, all as more fully set forth herein, and upon the proceedings held before this Court and good and sufficient cause appearing therefor,

A.     On November 9, 2010(the "Petition Date"), the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases"). The Debtors are now operating their businesses as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No request has been made for the appointment of a trustee or examiner and no official committee has yet been appointed in the Chapter 11 Cases.

B.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue of the Chapter 11 Case and the Motion in this district are proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**THE COURT HEREBY FINDS THAT:**

C.     An immediate and critical need exists for the Debtors to obtain funds in order to continue the operation of its business in accordance with the Budget (as hereinafter defined). Without such funds, the Debtors will not be able to pay its payroll and other direct operating expenses, and obtain goods and services needed to carry on its business in a manner that will avoid irreparable harm to the Debtors' estates. At this time, the Debtors' ability to finance their operations and the availability to them of sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations are vital to the confidence of the Debtors' vendors and suppliers of goods and services, to its customers, to its employees, and to the preservation and maintenance of the going concern value of the Debtors' estates. The Debtors are unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to section 364(a) or (b) of the Bankruptcy Code, or unsecured debt having the priority afforded by section 364(c)(1) of the Bankruptcy Code.

CHI02_60841828_2

D.    For the purpose of this Interim Order only, the Debtors acknowledge that almost all of the Debtors' assets (the "Prepetition Collateral") are subject to the liens granted by the Debtors prior to the Petition Date (the "Prepetition Liens") to, in the case of the Debtors' assets associated with their operations in Florida, Resort Finance America, LLC ("RFA"), and, in the case of the Debtors' assets associated with their operations in South Carolina, Textron Financial Corporation ("Textron" and, together with RFA, the "Prepetition Lenders"). Notwithstanding any of the foregoing, the Debtors assert that certain of the Prepetition Liens of RFA are avoidable as preferential transfers and recoverable for the benefit of the Debtors' estate pursuant to sections 547 and 550 of the Bankruptcy Code.

E.    For the purposes of this Interim Order only, the Debtors acknowledge that, subject to section 552 of the Bankruptcy Code, all cash collateral (as defined in Bankruptcy Code section 363(a)) in their possession or control arising from, or constituting proceeds of, the Prepetition Collateral and the Post-Petition Collateral (as hereinafter defined) constitutes collateral of the Prepetition Lenders (the "Cash Collateral")

F.    RFA have indicated that they are not willing to consent or agree to the Debtors' use of Cash Collateral or to provide financing to the Debtors pursuant to terms set forth in this Interim Order.

G.    The Post-Petition Lender is willing to provide the additional financing contemplated herein, all subject to the conditions set forth herein and the provisions of this Interim Order assuring that the Post-Petition Liens and the various claims, superpriority claims, and other protections granted pursuant to this Interim Order will not be affected by any subsequent reversal or modification of this Interim Order or any other order, as provided in section 364(e) of the Bankruptcy Code, which is applicable to the post-petition financing

arrangement contemplated by this Interim Order. The Post-Petition Lender has acted in good faith in consenting to and in agreeing to provide the post-petition financing contemplated by this Interim Order. The reliance of the Post-Petition Lender on the assurances referred to above is in good faith.

H.      Pursuant to the Bankruptcy Code and in light of the foregoing, the Debtors are required to provide adequate protection to the Prepetition Lenders in respect of their use of the Prepetition Collateral and granting of the Post-Petition Liens. The treatment requested by the Debtors for the Prepetition Lenders and provided by this Interim Order will minimize disputes and litigation over collateral values, priming, use of cash collateral, and the need to segregate the Prepetition Collateral and the proceeds thereof from the Post-Petition Collateral (as hereinafter defined) and the proceeds thereof.

I.      Notice of the hearing on the Motion and this Interim Order has been provided (by hand, email, facsimile, overnight mail, or courier) to counsel to the Prepetition Lenders, to the United States Trustee, and to the creditors listed on the statement filed by the Debtors pursuant to Bankruptcy Rule 1007(d) and Local Rule 1007-2. In view of the urgency of the relief requested, such notice constitutes sufficient notice under Bankruptcy Rules 4001(c)(2) and 4001(c)(3) and no other notice need be given.

J.      Good cause has been shown for the entry of this Interim Order. Among other things, entry of this Interim Order will minimize disruption of the Debtors' business and operations and permit them to meet payroll and other operating expenses, obtain needed supplies, and retain customer and supplier confidence by demonstrating an ability to maintain normal operations. The financing arrangement authorized hereunder is vital to avoid immediate

CHI02_60841828_2

and irreparable harm to the Debtors' estates. Consummation of such financing on an interim basis therefore is in the best interests of the Debtors' estates.

K.     The financing and adequate protection arrangements authorized hereunder have been negotiated in good faith and at arm's length among the Debtors and the Post-Petition Lender. The terms of such financing and adequate protection arrangements are fair and reasonable under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. As such, the Post-Petition Lender is entitled to the protections provided by section 364(e) of the Bankruptcy Code.

L.     The Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2). The permission granted herein to allow the Debtors to obtain funds hereunder is necessary to avoid immediate and irreparable harm to the Debtors and their estates. The entry of this Interim Order is in the best interests of the Debtors' estates as its implementation will, among other things, allow for the continued operation and rehabilitation of the Debtors' existing businesses.

**THEREFORE, IT IS HEREBY ORDERED AND ADJUDGED THAT:**

1.     The Debtors hereby are authorized to borrow money pursuant to the terms of this Interim Order and the provisions of the Post-Petition Loan Agreement and perform its obligations hereunder and thereunder, solely in accordance with, and subject to, the terms of this Interim Order, in compliance with and for the purposes of funding those expenses set forth in the budget attached hereto as **Exhibit A** (as may be supplemented from time to time, the "Budget") (the "Post-Petition Loans"). The Debtors shall be authorized to borrow funds pursuant to this Interim Order: (a) in the amounts set forth in the Budget (after taking the "Variance" (hereinafter

5

defined) into account), and (b) until the aggregate of the Post-Petition Loans reaches $6,500,000 (the "Loan Limit").  The determination of compliance with the Budget shall be made on a week-ending basis for each week until the occurrence of a Termination Event (hereinafter defined). Notwithstanding the foregoing, the Debtors shall be deemed to be in compliance with the Budget so long as its total cash disbursements, on a cumulative basis, tested weekly, are less than 105% of the amount provided for in the Budget for each respective week (the "Variance").  The Debtors are authorized to enter into such non-material modifications and amendments to the Budget without further Court order as may be agreed upon in writing by the Debtors and the Post-Petition Lender.  Pursuant to this Interim Order and the Post-Petition Loan Agreement, the Post-Petition Loans shall accrue interest on the outstanding principal amount thereof at a rate equal to 10% per annum.  Notwithstanding any other provision of this Interim Order, the Post-Petition Lender shall not have any obligation or commitment to make Post-Petition Loans pursuant to this Interim Order until the conditions precedent provided for herein have been satisfied, in which case, the Post-Petition Lender shall fund such amounts set forth in the Budget, absent any Default (as defined in the Post-Petition Loan Agreement) or other breach under the Post-Petition Loan Agreement and/or Termination Event or any order of the Court.

2.     Proceeds or payments of Prepetition Collateral secured by unavoided and/or unavoidable Prepetition Liens shall be applied, first, to the payment of the Prepetition Lenders' accrued interest, costs, and expenses related to the Prepetition Lenders' claims against the Debtors, and, next, to the payment of the Prepetition Lenders' principal related to the Prepetition Lenders' claims against the Debtors.  Proceeds of Post-Petition Collateral shall be applied, first, to the payment of the Post-Petition Lender's accrued interest, costs, and expenses related to the

Post-Petition Loans, and, next, to the payment of the Post-Petition principal related to the Post-Petition Loans.

3.      Any and all payments or proceeds remitted, or deemed to be remitted, to the Post-Petition Lender pursuant to the provisions of paragraph 2 of this Interim Order shall be received, or deemed received, by the Post-Petition Lender free and clear of any claim, charge, assessment, or other liability including, without limitation, any such claim or charge arising out of or based on section 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtors. In consideration for the financial accommodations herein, each of the Debtors hereby waives and releases their rights to assert a claim against the Post-Petition Lender under section 506(c) of the Bankruptcy Code relating to the Prepetition Collateral or the Post-Petition Collateral.

4.      As security for all loans, advances, and any other indebtedness or obligations, contingent or absolute, which may now or from time to time hereafter be owing by the Debtors to the Post-Petition Lender hereunder (all such loans, advances, indebtedness or obligations are the "<u>Post-Petition Loans</u>"), the Post-Petition Lender is hereby granted valid, binding, enforceable, and perfected security interests in and liens (the "<u>Post-Petition Liens</u>") in and to all currently owned or hereafter acquired property and assets of each of the Debtors of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising, and all proceeds, products, rents and profits thereof, including, without limitation, all cash, goods, accounts, accounts receivable, inventory, chattel paper, instruments, documents, letter of credit rights, cash-in-advance deposits, general intangibles, contracts, patents, deposit accounts, real estate, fixtures, machinery, securities, investment property, financial assets, software, equipment, vehicles, trademarks, trade names, licenses,

CHI02_60841828_2

litigation proceeds (including any causes of action or any proceeds of any causes of action arising under sections 544, 547, 548, 550, or 551 of the Bankruptcy Code), rights to payment including tax refund claims, insurance proceeds and tort claims and the proceeds, products, rents, and profits of all of the foregoing (all of the foregoing, the "Post-Petition Collateral"), which Post-Petition Liens are in each case: (a) junior in priority only to Permitted Liens (as defined in the Post-Petition Credit Agreement) that are valid, binding, enforceable, and perfected liens existing in the Prepetition Collateral on the Petition Date and that are not subject to avoidance or subordination pursuant to section 364(c)(3) of the Bankruptcy Code, and (b) senior and superior liens on all property of the Debtors' estates that is not otherwise subject to a security interest or lien, pursuant to section 364(c)(2) of the Bankruptcy Code.

5.     Except as expressly set forth in this Interim Order, the liens granted in this Interim Order: (a) shall be subject to any Permitted Liens, but not to any other lien which is avoided and preserved for the benefit of the Debtors' estate under section 551 of the Bankruptcy Code; and (b) shall not be subordinated to or made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise; and (c) shall be subject to the unpaid fees of the clerk of the Bankruptcy Court or District Court, as applicable, and of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and (b).

6.     As adequate protection under section 364(d)(1)(B) of the Bankruptcy Code, the Prepetition Lender is hereby granted valid, binding, enforceable and perfected liens (the "Adequate Protection Liens") in all Post-Petition Collateral to secure an amount of Prepetition Indebtedness (the "Adequate Protection Obligations") equal to the sum of the aggregate amount of diminution in value of their respective Prepetition Collateral, if any, whether by depreciation, use, sale, loss, decline in market price, or otherwise resulting from Debtors' use of the

Prepetition Lenders' Cash Collateral and the granting of the Post-Petition Liens. The Adequate Protection Liens are subject only to: (i) the Post-Petition Liens; and (ii) any liens or security interests existing on or in the Post-Petition Collateral that are valid, binding, enforceable, and perfected liens on the Petition Date that are not otherwise subject to avoidance or subordination. For the avoidance of doubt, the Adequate Protection Liens granted to RFA and Textron shall attach only to those assets of the Debtors that would have constitute Prepetition Collateral of each respective Prepetition Lender.

7. In addition, (a) the Post-Petition Loans shall have priority in accordance with the provisions of section 364(c)(1) of the Bankruptcy Code over all administrative expenses of the kind specified in sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), or 726 of the Bankruptcy Code ("Superpriority"), and (b) the Adequate Protection Obligations shall have Superpriority, subject only the aforementioned priorities of the Post-Petition Loans. No costs or administrative expenses that have been or may be incurred in the Debtors' Chapter 11 Cases, in any conversion of the Debtors' Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, or in any other proceeding related thereto, and no priority claims, including, without limitation, any other Superpriority claims, are or will be prior to or on a parity with the claims of the Post-Petition Lender against the Debtors arising, as applicable, out of the Post-Petition Loans or any provision of this Interim Order or with the liens and security interests granted herein on, in and to the Post-Petition Collateral.

8. The Post-Petition Loans shall become due and payable, without notice or demand, on the Termination Date (as hereinafter defined). From and after the Termination Date, the Post-Petition Lender shall have no obligation to lend, and the Debtors shall have no authority to use Post-Petition Collateral of the Post-Petition Lender.

9

9.      From and after the Petition Date, the proceeds of the Post-Petition Loans, the Prepetition Collateral, and the Post-Petition Collateral shall not, directly or indirectly, be used to pay expenses of the Debtors or otherwise disbursed except for: (a) those expenses, payments, and/or disbursements that are set forth in the Budget and expressly permitted or under this Interim Order; (b) amounts due to the Post-Petition Lender, and their accountants, attorneys, or other professionals hereunder or under the Post-Petition Loan Agreement, which amounts shall be reasonable; and (c) any other expenses or payments authorized by the Court; provided that the foregoing shall not be construed as consent to the allowance of any of the amounts referred to in the preceding clauses (a) through (c) and shall not affect the right of the Post-Petition Lender to object to the allowance and payment of such amounts.  No consent by the Post-Petition Lender to any administrative claims, including fees and expenses of professionals, sought to be assessed against or attributed to the Post-Petition Lender or their respective interests in the Post-Petition Collateral pursuant to the provisions of section 506(c) of the Bankruptcy Code or otherwise by, through or on behalf of the Debtors, shall be implied from any action, inaction or acquiescence by the Post-Petition Lender or otherwise.  Except as set forth in the first sentence of this paragraph 9, the Post-Petition Lender has not consented or agreed to the use of the proceeds of the Post-Petition Loans or the Post-Petition Collateral.

10.     The automatic stay extant under Bankruptcy Code section 362(a) shall be, and it hereby is, modified to the extent necessary to permit the Post-Petition Lender to retrieve, collect, and apply payments and proceeds in respect of the Post-Petition Collateral in accordance with the terms and provisions of this Interim Order.

11.     Notwithstanding anything herein, the Debtors shall no longer, pursuant to this Interim Order, or otherwise, be authorized to borrow funds hereunder or to use Cash Collateral

or any proceeds of the Post-Petition Loans already received (and any obligation of the Post-Petition Lender to make loans or advances hereunder shall be terminated) upon the earliest to occur of any of the following events (any such event shall be referred to as a "Termination Event" and the date of any such event shall be referred to as the "Termination Date"):

(a)     material non-compliance by any Debtors with any of the terms or provisions of the Budget (including the Debtors' failure to comply with the Variance) or this Interim Order;

(b)     any default or event of default under the Post-Petition Loan Agreement;

(c)     the Debtors' failure to: (i) provide the Post-Petition Lender with the Debtors' proposed Final Order budget on or before November 30, 2010; (ii) to procure entry of a Final Order on or before December 10, 2010; (iii) prepare and file an adversary proceeding against RFA to avoid and recover certain transfers of property of the Debtors made to RFA as preferences and fraudulent transfers under sections 547, 548, and 550 of the Bankruptcy Code on or before 5 business days from the Petition Date; (iv) prepare and file a plan and disclosure statement (acceptable in form and substance to the Post-Petition Lender) with the Court on or before December 6, 2010, that will include, among other provisions, the sale of substantially all of the Debtors' assets; (v) obtain a final order, in the form and substance acceptable to the Post-Petition Lender, approving the Debtors' disclosure statement on or before January 7, 2011; (vi) obtain a final order confirming the Debtors' plan (all of which shall be acceptable in form and substance to the Post-Petition Lender) on or before February 6, 2011; and (vii) consummate any sale(s) contemplated by the plan and fully, finally, and indefeasibly satisfy the Post-Petition Loans as of February 18, 2011;

(d)     the Maturity Date (as defined below).

12.     All obligations and commitments of the Post-Petition Lender under the Post-Petition Loan Agreement and/or this Interim Order, shall terminate at the earliest of the following (the "Maturity Date"): (a) February 18, 2011; (b) the consummation of the sale of substantially all of the Debtors' assets pursuant to the approved plan; (c) the effective date of any plan of reorganization; (d) the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (e) the appointment of a Chapter 11 trustee; or (f) dismissal of any of the Chapter 11 Cases.

13.     Three business days after the occurrence of a Termination Event under this Interim Order, and after providing written notice to counsel for any Committee (as hereinafter defined), the Office of the United States Trustee and counsel to other known holders of liens on the Prepetition Collateral, the Post-Petition Lender, shall have the right, to seek expedited relief from the automatic stay extant pursuant to section 362 of the Bankruptcy Code to exercise the rights granted them under the Post-Petition Loan Agreement and this Interim Order as to all or such part of the Collateral as the Post-Petition Lender in its sole discretion shall elect, including the right to take possession of and sell the Collateral in accordance with the terms of the Florida Uniform Commercial Code to satisfy the Post-Petition Loans.

14.     Notwithstanding the occurrence of the Termination Date or anything herein to the contrary, all of the rights, remedies, benefits and protections provided to the Post-Petition Lender under this Interim Order shall survive the Termination Date.  Upon the Termination Date, the principal of and accrued interest and fees and all other amounts owed to the Post-Petition Lender hereunder or under the Post-Petition Loan Agreement shall be immediately due and payable and the Post-Petition Lender shall have all other rights and remedies provided hereunder and in the Post-Petition Loan Agreement.  Notwithstanding anything herein, none of the proceeds of the

CHI02_60841828_2

Post-Petition Loans, or the proceeds of the Post-Petition Collateral shall be used for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the rights of the Post-Petition Lender under chapter 5 of the Bankruptcy Code against the Post-Petition Lender; (b) preventing, hindering, or delaying the Post-Petition Lender in the enforcement or realization upon any of the Collateral; (c) using Post-Petition Collateral except as specifically permitted in this Interim Order or by order of the Bankruptcy Court; (d) incurring indebtedness except as permitted by this Interim Order; or (e) modifying the rights of the Post-Petition Lender under the Post-Petition Loan Agreement.

15.     Based upon the record presented to the Court by the Debtor, the Post-Petition Lender shall be entitled to all of the benefits of section 364(e) of the Bankruptcy Code for all post-petition advances made to the Debtors.

16.     If it shall be necessary for the Post-Petition Lender, at any time, to exercise any of its rights and remedies hereunder or under applicable law in order to effect repayment of the Post-Petition Loans or to receive any amounts or remittances due hereunder, including without limitation, foreclosing upon and selling all or a portion of the Post-Petition Collateral, the Post-Petition Lender shall have the right to exercise such rights and remedies as to all or such part of the Post-Petition Collateral as the Post-Petition Lender shall, in its sole discretion, elect, subject to the Post-Petition Lender, as applicable, to seek expedited relief from the automatic stay of section 362 of the Bankruptcy Code.  The Post-Petition Lender shall be entitled to apply the payments or proceeds of the Post-Petition Collateral, after seeking expedited authority from the Bankruptcy Court, in accordance with the provisions of this Interim Order, and in no event shall the Post-Petition Lender be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Post-Petition Collateral or otherwise.

CHI02_60841828_2

17.     Except as provided herein, the Debtors shall be enjoined and prohibited from, at any time during the Chapter 11 Cases, granting liens in the Prepetition Collateral, the Post-Petition Collateral or any portion thereof to any other parties pursuant to section 364 of the Bankruptcy Code or otherwise, which liens are senior, or on a parity with, or junior to the liens of the Post-Petition Lender therein. Except in accordance with the terms of this Interim Order, the Debtors shall be enjoined and prohibited from at any time: (a) using the Post-Petition Collateral; and (b) so long as this Interim Order is effective, applying to the Bankruptcy Court or any Judge of any United States District Court for an order authorizing the use of the Post-Petition Lender's Collateral.

18.     The Debtors shall execute and deliver to the Post-Petition Lender all such agreements, financing statements, instruments and other documents as the Post-Petition Lender may reasonably request to evidence, confirm, validate, or perfect the liens granted pursuant hereto.

19.     The Debtors shall permit representatives, agents, and/or employees of the Post-Petition Lender to have reasonable access to its premises and its records during normal business hours (without unreasonable interference with the proper operation of the Debtors' business) and shall cooperate, consult with, and provide to such persons all such non-privileged information as they may reasonably request.

20.     All costs, fees, charges, and expenses of the Prepetition Lender and the Post-Petition Lender for their reasonable costs, fees (including reasonable attorneys' fees), charges, and expenses to the extent provided for in the hereunder and/or the Prepetition Credit Agreement, as the case may be, or incurred in connection with the Chapter 11 Case shall be part of the Post-Petition Loans and shall have the same rights, status and priority as the Post-Petition

CHI02_60841828_2

Loans. All liens granted herein to secure repayment of the Post-Petition Loans shall, pursuant to this Interim Order be, and they hereby are, deemed perfected, and no further notice, filing or other act shall be required to effect such perfection; provided, however, if the Post-Petition Lender shall, in its sole discretion, chooses to file such mortgages, financing statements, notices of liens and security interests, and/or other similar documents, all such mortgages, financing statements, and/or similar instruments shall be deemed to have been filed or recorded at the time and on the date of entry of this Interim Order, and the automatic stay of section 362 of the Bankruptcy Code is hereby vacated to effect such filings.

21. In making decisions to advance moneys or extend financial accommodations of any nature under this Interim Order or the Prepetition Financing Documents, in administering the Debtors' use of Cash Collateral or any advances, loans, or financial accommodations of any sort under this Interim Order or under the Prepetition Financing Documents, or in taking any other action related to or in connection with the Budget or any of the foregoing, the Prepetition Lender or the Post-Petition Lender shall not have any liability to any third party, and they shall not be deemed to be in control of the operations of the Debtor, an "employer" of any of the Debtors' employees, or to be acting as a "responsible person" or managing agent with respect to the operation or management of the Debtor.

22. The provisions of this Interim Order shall be binding upon and inure to the benefit of the Prepetition Lender, the Post-Petition Lender, and the Debtors and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the properties of the estate of the Debtor).

23. Based upon the record presented to the Court by the Debtors and the findings set forth above of this Interim Order and in accordance with section 364(e) of the Bankruptcy Code,

which is applicable to the post-petition financing arrangement contemplated by this Interim Order and the Post-Petition Loan Agreement, in the event any or all of the provisions of this Interim Order are hereafter modified, amended, or vacated by a subsequent order of this or any other Court, no such modification, amendment, or vacation shall affect the validity and enforceability of any lien or priority authorized or created hereby. Notwithstanding any such modification, amendment, or vacation, any claim or lien granted to the Post-Petition Lender hereunder arising prior to the effective date of such modification, amendment, or vacation shall be governed in all respects by the original provisions of this Interim Order, and the Post-Petition Lender shall be entitled to all of the rights, remedies, privileges, and benefits, including the liens and priorities granted herein, with respect to any such claim.

24.     The Debtors is authorized to do and perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, mortgages, and financing statements) and to pay fees and expenses which may be required or necessary for the Debtors' performance hereunder.

25.     The obligations of the Debtors in respect of the Post-Petition Loans shall not be discharged by the entry of an order confirming a plan of reorganization in this case.

26.     Notwithstanding anything to the contrary herein, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair: (a) any of the rights of the Post-Petition Lender under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the Post-Petition Lender to: (i) request additional adequate protection of their interests in the Post-Petition Collateral or relief from or modification of the automatic stay extant under section 362 of the Bankruptcy Code, (ii) request conversion of the Chapter 11 Cases to chapter 7, and (iii) propose, subject to the

provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans; or (b) any other rights, claims or privileges (whether legal, equitable or otherwise) of the Post-Petition Lender.

27. In the event there are any inconsistencies between the provisions of the Post-Petition Loan Agreement and this Order, the provisions of this Order shall control.

28. This Interim Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof. There is no just reason to delay enforcement or appeal of this Interim Order.

DONE and ORDERED on

_____
KAREN S. JENNEMANN
United States Bankruptcy Judge

Copies furnished to:

Debtor: ;

Debtors' Counsel: ;

Local Rule 1007-2 Parties-in-Interest List; and

Office of the U. S. Trustee, 135 W. Central Boulevard, Suite 620, Orlando, Florida 32801.

In re:  TEMPUS RESORTS INTERNATIONAL, LTD., et al.
CASE NO.:  6:10-bk-20709-KSJ


**EXHIBIT "B"**

**Tempus Resorts International**
**Weekly DIP Budget**

| | 363 Wk 1 Ended 11/28/10 | 363 Wk 2 Ended 12/05/10 | 363 Wk 3 Ended 12/12/10 | 363 Wk 4 Ended 12/19/10 | 363 Wk 5 Ended 12/26/10 | 363 Wk 6 Ended 01/02/11 | 363 Wk 7 Ended 01/09/11 |
|---|---|---|---|---|---|---|---|
| **I. Beginning Cash Book Balance** | $ - | $ 250,000 | $ 250,000 | 250,000 | 250,000 | 250,000 | $ 250,000 |
| **II. Cash Inflows:** | | | | | | | |
| Resort Cash Inflow | 67,327 | 25,338 | 29,785 | 33,096 | 41,489 | 91,026 | 27,066 |
| Golf Course Cash Inflow | 14,802 | 23,817 | 33,206 | 18,862 | 23,107 | 32,218 | 23,356 |
| Other Operating Revenue | 21,004 | 21,004 | 20,221 | 20,221 | 20,221 | 20,221 | 15,646 |
| Subtotal Revenue Related Cash Inflows | 103,133 | 70,159 | 83,212 | 72,180 | 84,818 | 143,465 | 66,068 |
| DIP Financing Draws | 738,578 | 855,619 | 758,513 | 738,169 | 482,087 | 183,890 | 487,905 |
| **Total Cash Inflows** | 841,711 | 925,778 | 841,725 | 810,348 | 566,904 | 327,355 | 553,973 |
| **III. Expense Related Cash Outflows:** | | | | | | | |
| **III-A] Payroll:** | | | | | | | |
| Sales & Marketing | 14,342 | 359,134 | - | 163,909 | 11,145 | 123,645 | - |
| Resort | - | 210,692 | - | 206,384 | - | 206,384 | - |
| G&A | - | 300,000 | - | 284,965 | - | 247,287 | - |
| Subtotal Payroll | 14,342 | 869,826 | - | 655,257 | 11,145 | 577,316 | - |
| **III-B] Resort Related:** | | | | | | | |
| Advertising & Promotions | - | - | 5,446 | 1,815 | 1,815 | 1,815 | 10,402 |
| Operational Leases | - | - | 25,868 | - | 624 | - | - |
| Computer Maintenance/Software | - | - | 4,945 | - | - | - | - |
| Professional Services - Security & Fire Alarms | - | - | 7,238 | - | - | - | 2,568 |
| Interval International Fees | - | - | - | - | - | - | - |
| Food & Beverage | 13,372 | 13,372 | 15,298 | 15,298 | 15,298 | 15,298 | 12,496 |
| Repairs & Maintenance | - | - | 17,316 | 17,316 | 4,567 | 4,567 | 19,056 |
| Cleaning Services | - | - | 33,369 | 33,369 | 33,369 | 33,369 | 60,216 |
| Landscaping Services | - | - | - | 12,335 | - | - | - |
| Storage Leases | - | - | - | 3,883 | - | - | - |
| Uniforms | 850 | 850 | 850 | 850 | 850 | 850 | 1,701 |
| Transportation | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 |
| Utilities | - | - | - | - | 27,573 | - | - |
| Taxes, Licenses and Fees | 78,044 | - | - | - | 76,633 | - | 30 |
| Golf Course Maintenance | - | - | 83,519 | - | - | - | 83,519 |
| Pro Shop Inventory | - | - | 8,414 | - | - | - | 9,767 |
| Dunes Village HOA Fees | - | - | - | - | 22,096 | - | - |
| Printing | - | - | - | 4,330 | - | - | 776 |
| Supplies | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 4,300 | 15,000 |
| Resort-Other | 12,367 | 2,996 | 2,996 | 2,996 | 2,996 | 2,996 | 7,763 |
| Subtotal Resort Related | 110,734 | 23,319 | 211,357 | 98,292 | 191,920 | 64,995 | 225,092 |

| Tempus Resorts International Weekly DIP Budget | 363 Wk 1 Ended 11/28/10 | 363 Wk 2 Ended 12/05/10 | 363 Wk 3 Ended 12/12/10 | 363 Wk 4 Ended 12/19/10 | 363 Wk 5 Ended 12/26/10 | 363 Wk 6 Ended 01/02/11 | 363 Wk 7 Ended 01/09/11 |
|---|---|---|---|---|---|---|---|
| **III-C) G&A Related:** | | | | | | | |
| Health Insurance | - | - | - | - | 150,000 | - | - |
| 401k Contributions | 15,000 | - | 15,000 | - | 15,000 | - | - |
| Workers Compensation Insurance | - | - | - | 19,024 | - | - | 16,159 |
| Life Insurance | - | - | - | 8,750 | - | - | - |
| Payroll Service Fees | 5,200 | - | 2,700 | - | 5,200 | - | 3,761 |
| Office Rents | - | 85,660 | - | - | - | - | 85,660 |
| Business Insurance | - | - | - | - | - | - | - |
| Operational Leases | - | 15,749 | - | 7,776 | - | - | 14,903 |
| Professional Services - Audit & Tax | - | - | - | - | 4,439 | - | - |
| Professional Services - Legal | - | - | - | - | 846 | - | - |
| Professional Services - Security & Fire Alarms | - | - | - | - | - | - | - |
| Professional Services - Other | - | - | - | - | - | - | - |
| Title & Foreclosure Costs | - | - | - | - | 7,000 | - | - |
| Postage & Shipping | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 1,050 | 980 |
| Repairs & Maintenance | 1,000 | - | - | - | 1,000 | - | - |
| Utilities | - | - | 33,309 | 237,040 | 50,496 | - | - |
| Taxes, Licenses and Fees | 500 | - | - | - | 500 | - | - |
| Printing | - | - | - | 11,236 | - | - | 1,561 |
| Supplies | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | - | - |
| Credit Card Merchant & Processing Fees | 1,724 | 149,709 | - | - | 1,000 | 1,000 | 650 |
| Mortgage Servicing & Credit Scoring | - | - | 500,000 | 24,781 | - | 24,781 | 133,615 |
| G & A - Other | 181,162 | 17,308 | 17,308 | 17,308 | 27,308 | 17,308 | 16,592 |
| Subtotal G&A Related | 206,635 | 270,476 | 570,367 | 327,966 | 263,840 | 44,139 | 273,881 |
| **III-D) Less Reimbursement from HOA for Management Fee & Payments Made on its Behalf** | - | 164,262 | - | - | - | 304,500 | - |
| **Subtotal Expense Related Cash Outflows** | 331,711 | 999,358 | 781,725 | 777,015 | 466,904 | 381,950 | 498,973 |
| **IV. Legal/Professional/Court Fees Related to Reorg Process:** | | | | | | | |
| Debtor Counsel | - | - | - | - | - | - | - |
| DIP Lender Counsel | 25,000 | - | - | - | - | - | - |
| Unsecured Creditors Committee Counsel | - | - | - | - | 25,000 | - | - |
| US Trustee | - | - | - | 33,333 | - | - | - |
| Restructuring Specialist | - | - | 45,000 | - | - | - | 45,000 |
| PR Firm | - | - | 15,000 | - | - | - | 10,000 |
| Subtotal Legal/Professional/Court Fees | 25,000 | - | 60,000 | 33,333 | 25,000 | - | 55,000 |
| **V. DIP Debt Service** | | | | | | | |
| DIP Commitment Fee | 160,000 | - | - | - | - | - | - |
| DIP Interest | - | 1,420 | - | - | - | 20,405 | - |
| DIP Debt Service Paid by Tempus | 160,000 | 1,420 | - | - | - | 20,405 | - |
| **VI. Working Capital Cash Inflows / (Outflows) Related to Processing Customer Mortgage Payments (Note 1)** | (75,000) | 75,000 | - | - | (75,000) | 75,000 | - |
| **VII. Ending Cash Book Balance** | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 | $ 250,000 |

Tempus Resorts International
Weekly DIP Budget

| | 363 Wk 1 Ended 11/28/10 | 363 Wk 2 Ended 12/05/10 | 363 Wk 3 Ended 12/12/10 | 363 Wk 4 Ended 12/19/10 | 363 Wk 5 Ended 12/26/10 | 363 Wk 6 Ended 01/02/11 | 363 Wk 7 Ended 01/09/11 |
|---|---|---|---|---|---|---|---|
| VIII. Supplemental - Outstanding DIP Loan Amount | $ 738,578 | $ 1,594,197 | $ 2,352,710 | $ 3,090,878 | $ 3,572,965 | $ 3,756,855 | $ 4,244,761 |

| | 363 Wk 8 Ended 01/16/11 | 363 Wk 9 Ended 01/23/11 | 363 Wk 10 Ended 01/30/11 | 363 Wk 11 Ended 02/06/11 | 363 Wk 12 Ended 02/13/11 | 363 Wk 13 Ended 02/20/11 |
|---|---|---|---|---|---|---|
| **I. Beginning Cash Book Balance** | $ 250,000 | $ 250,000 | 250,000 | $ 453,793 | $ 250,000 | $ 250,539 |
| **II. Cash Inflows:** | | | | | | |
| Resort Cash Inflow | 41,925 | 31,892 | 41,479 | 50,544 | 55,146 | 106,405 |
| Golf Course Cash Inflow | 50,806 | 47,210 | 62,958 | 44,555 | 40,568 | 64,099 |
| Other Operating Revenue | 15,646 | 15,646 | 15,646 | 15,646 | 9,550 | 9,550 |
| Subtotal Revenue Related Cash Inflows | 108,377 | 94,748 | 120,083 | 110,745 | 105,265 | 180,054 |
| DIP Financing Draws | 300,552 | 587,314 | - | 62,858 | - | 261,490 |
| **Total Cash Inflows** | 408,929 | 682,061 | 120,083 | 173,603 | 105,265 | 441,543 |
| **III. Expense Related Cash Outflows:** | | | | | | |
| **III-A) Payroll:** | | | | | | |
| Sales & Marketing | 52,407 | 22,195 | 44,963 | - | 44,963 | - |
| Resort | 206,384 | - | 206,384 | - | 206,384 | - |
| G&A | 284,965 | - | 247,287 | - | 247,287 | - |
| Subtotal Payroll | 543,755 | 22,195 | 498,634 | - | 498,634 | - |
| **III-B) Resort Related:** | | | | | | |
| Advertising & Promotions | 29,567 | 4,157 | 4,157 | 4,157 | 4,157 | 4,157 |
| Operational Leases | 25,245 | - | 624 | - | 25,245 | - |
| Computer Maintenance/Software | - | 2,637 | - | - | - | - |
| Professional Services - Security & Fire Alarms | 2,568 | 2,568 | 2,568 | 2,568 | 446 | 446 |
| Interval International Fees | - | - | - | - | - | - |
| Food & Beverage | 12,496 | 12,496 | 12,496 | 12,496 | 14,423 | 14,423 |
| Repairs & Maintenance | 19,056 | 19,056 | 19,056 | 19,056 | 14,827 | 14,827 |
| Cleaning Services | 60,216 | 60,216 | 60,216 | 60,216 | 42,985 | 42,985 |
| Landscaping Services | 14,500 | - | - | - | 14,500 | - |
| Storage Leases | - | 2,674 | - | - | - | - |
| Uniforms | 1,701 | 1,701 | 1,701 | 1,701 | 237 | 237 |
| Transportation | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 | 1,800 |
| Utilities | 87,000 | - | - | - | - | 80,000 |
| Taxes, Licenses and Fees | 97,653 | 73,362 | - | - | 225 | 115 |
| Golf Course Maintenance | - | - | - | - | 83,519 | - |
| Pro Shop Inventory | 13,087 | 8,411 | 1,528 | 2,956 | 11,203 | - |
| Dunes Village HOA Fees | - | 22,096 | - | - | - | 22,096 |
| Printing | 4,714 | 469 | 59 | 2,967 | 662 | 2,632 |
| Supplies | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| Resort-Other | 7,763 | 7,763 | 7,763 | 7,763 | 4,190 | 4,190 |
| Subtotal Resort Related | 392,365 | 234,407 | 126,966 | 130,679 | 233,418 | 202,909 |

**Tempus Resorts International**
**Weekly DIP Budget**

| | 363 Wk 8 Ended 01/16/11 | 363 Wk 9 Ended 01/23/11 | 363 Wk 10 Ended 01/30/11 | 363 Wk 11 Ended 02/06/11 | 363 Wk 12 Ended 02/13/11 | 363 Wk 13 Ended 02/20/11 |
|---|---|---|---|---|---|---|
| **III-C) G&A Related:** | | | | | | |
| Health Insurance | - | 150,000 | - | - | - | - |
| 401k Contributions | - | 16,159 | - | 16,159 | - | 16,159 |
| Workers Compensation Insurance | - | 19,024 | - | - | - | 19,024 |
| Life Insurance | 8,750 | - | - | - | 8,750 | - |
| Payroll Service Fees | - | 2,700 | 6,500 | 2,700 | - | 2,700 |
| Office Rents | - | - | - | 85,660 | - | - |
| Business Insurance | - | - | - | - | - | - |
| Operational Leases | 7,776 | - | 4,439 | 14,903 | - | 7,776 |
| Professional Services - Audit & Tax | - | - | 846 | - | - | - |
| Professional Services - Legal | - | - | - | - | - | - |
| Professional Services - Security & Fire Alarms | - | - | - | - | - | - |
| Professional Services - Other | 7,000 | - | - | 7,000 | - | - |
| Title & Foreclosure Costs | - | - | - | - | - | - |
| Postage & Shipping | 980 | 980 | 980 | 980 | 1,222 | 1,222 |
| Repairs & Maintenance | - | 1,000 | - | - | - | 1,000 |
| Utilities | 75,000 | - | - | - | - | 61,000 |
| Taxes, Licenses and Fees | - | - | - | - | - | - |
| Printing | 6,060 | 241 | - | - | 488 | 112 |
| Supplies | 650 | 650 | 650 | 650 | 650 | 650 |
| Credit Card Merchant & Processing Fees | - | - | 1,683 | 102,073 | - | - |
| Mortgage Servicing & Credit Scoring | - | 24,781 | - | - | - | 24,781 |
| G & A - Other | 16,592 | 26,592 | 16,592 | 16,592 | 16,563 | 16,563 |
| Subtotal G&A Related | 122,809 | 242,127 | 31,690 | 246,717 | 27,673 | 150,987 |
| **III-D) Less Reimbursement from HOA for Management Fee & Payments Made on Its Behalf** | 700,000 | - | 700,000 | - | 700,000 | - |
| **Subtotal Expense Related Cash Outflows** | 358,929 | 498,728 | (42,709) | 377,396 | 59,725 | 353,896 |
| **IV. Legal/Professional/Court Fees Related to Reorg Process:** | | | | | | |
| Debtor Counsel | - | 50,000 | - | - | - | - |
| DIP Lender Counsel | - | 25,000 | - | - | - | - |
| Unsecured Creditors Committee Counsel | - | 33,333 | - | - | - | 33,333 |
| US Trustee | - | - | 75,000 | - | - | 25,000 |
| Restructuring Specialist | 50,000 | - | - | - | 45,000 | - |
| PR Firm | - | - | - | - | - | - |
| Subtotal Legal/Professional/Court Fees | 50,000 | 108,333 | 75,000 | - | 45,000 | 58,333 |
| **V. DIP Debt Service** | | | | | | |
| DIP Commitment Fee | - | - | - | - | - | - |
| DIP Interest | - | - | 33,999 | - | - | 29,853 |
| DIP Debt Service Paid by Tempus | - | - | 33,999 | - | - | 29,853 |
| **VI. Working Capital Cash Inflows / (Outflows) Related to Processing Customer Mortgage Payments (Note 1)** | - | (75,000) | 75,000 | - | - | - |
| **VII. Ending Cash Book Balance** | $ 250,000 | $ 250,000 | $ 453,793 | $ 250,000 | $ 250,539 | $ 250,000 |

Tempus Resorts International
Weekly DIP Budget

VIII. Supplemental - Outstanding DIP Loan Amount

| | 363 Wk 8 Ended 01/16/11 | 363 Wk 9 Ended 01/23/11 | 363 Wk 10 Ended 01/30/11 | 363 Wk 11 Ended 02/06/11 | 363 Wk 12 Ended 02/13/11 | 363 Wk 13 Ended 02/20/11 |
|---|---|---|---|---|---|---|
| | $ 4,545,312 | $ 5,132,626 | $ 5,132,626 | $ 5,195,484 | $ 5,195,484 | $ 5,456,974 |