**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

In re:                                    CASE NO. 6:10-bk-20709-KSJ

**TEMPUS RESORTS**                        CHAPTER 11
**INTERNATIONAL, LTD.**, *et al.*
                                          Jointly-administered with Cases No.
          **Debtors.**                    **6:10-bk-20712-KSJ; 6:10-bk-20714-KSJ;**
                                          **6-10-bk-20715-KSJ; 6-10-bk-20716-KSJ;**
                                          **6:10-bk-20717-KSJ; 6:10-bk-20718-KSJ;**
_____/          **6:10-bk-20719-KSJ; and 6:10-bk-20720-KSJ**

JOINT DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125,
FOR TEMPUS RESORTS INTERNATIONAL, LTD., TEMPUS PALMS
INTERNATIONAL, LTD., TEMPUS GOLF DEVELOPMENT, LLC, TEMPUS
SELECT, LLC, BACKSTAGE MYRTLE BEACH, LLC, TEMPUS RESORTS
MANAGEMENT, LTD., TEMPUS RESORTS REALTY, LLC, TEMPUS
INTERNATIONAL MARKETING ENTERPRISES, LTD., TIME RETAIL, LLC

COUNSEL FOR DEBTORS

JIMMY D. PARRISH. ESQ.
ELIZABETH A. GREEN, ESQ.
BAKER & HOSTETLER LLP
200 S. ORANGE AVE.
SUNTRUST CENTER, SUITE 2300
ORLANDO, FLORIDA  32801-3432

DECEMBER 31, 2010

## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

| | |
|---|---|
| **In re:** | **CASE NO. 6:10-bk-20709-KSJ** |
| **TEMPUS RESORTS INTERNATIONAL, LTD.**, *et al.* | **CHAPTER 11** |
| **Debtors.** | **Jointly-administered with Cases No. 6:10-bk-20712-KSJ; 6:10-bk-20714-KSJ; 6-10-bk-20715-KSJ; 6-10-bk-20716-KSJ; 6:10-bk-20717-KSJ; 6:10-bk-20718-KSJ; 6:10-bk-20719-KSJ; and 6:10-bk-20720-KSJ** |
| _____/ | |

## JOINT DISCLOSURE STATEMENT, PURSUANT TO 11 U.S.C. §1125, FOR TEMPUS RESORTS INTERNATIONAL, LTD., TEMPUS PALMS INTERNATIONAL, LTD., TEMPUS GOLF DEVELOPMENT, LLC, TEMPUS SELECT, LLC, BACKSTAGE MYRTLE BEACH, LLC, TEMPUS RESORTS MANAGEMENT, LTD., TEMPUS RESORTS REALTY, LLC, TEMPUS INTERNATIONAL MARKETING ENTERPRISES, LTD., TIME RETAIL, LLC

**I.     INTRODUCTION AND SUMMARY**

This Disclosure Statement (the "Disclosure Statement") is filed pursuant to the requirements of Section 1125 of Title 11 of the United States Code (the "Code"). This Disclosure Statement is intended to provide adequate information to enable holders of claims in the above-captioned jointly administered bankruptcy cases (the "Bankruptcy Cases") to make informed judgments about the Joint Plan of Reorganization (the "Plan") submitted by Tempus Resorts International, Ltd. ("Tempus International"), Tempus Palms International, Ltd. ("Tempus Palms"), Tempus Golf Development, LLC ("Tempus Golf"), Tempus Select, LLC ("Tempus Select"), Backstage Myrtle Beach, LLC ("Backstage"), Tempus Resorts Management, Ltd. ("Tempus Management"), Tempus Resorts Realty, LLC ("Tempus Realty"), Tempus International Marketing Enterprises, Ltd. ("Tempus Marketing"), and TIME Retail, LLC ("TIME Retail") (collectively, the "Debtors"). The overall purpose of the Plan is to restructure the

103669756.2

Debtors' liabilities in a manner designed to maximize recoveries to all stakeholders. The Debtors believe the Plan is reasonably calculated to lead to the best possible outcome for all creditors in the shortest amount of time and preferable to all other alternatives.

**THIS DISCLOSURE STATEMENT AND ITS RELATED DOCUMENTS ARE THE ONLY DOCUMENTS AUTHORIZED BY THE BANKRUPTCY COURT TO BE USED IN CONNECTION WITH THE SOLICITATION OF VOTES TO ACCEPT THE PLAN. THIS INTRODUCTION AND SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE REMAINING PORTIONS OF THIS DISCLOSURE STATEMENT AND THIS DISCLOSURE STATEMENT IN TURN IS QUALIFIED, IN ITS ENTIRETY, BY THE PLAN. THE PLAN IS AN INTEGRAL PART OF THIS DISCLOSURE STATEMENT AND ANY HOLDER OF ANY CLAIM OR INTEREST SHOULD READ AND CONSIDER THE PLAN CAREFULLY IN LIGHT OF THIS DISCLOSURE STATEMENT IN MAKING AN INFORMED JUDGMENT ABOUT THE PLAN. IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE PLAN CONTROLS. ALL CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE DEFINITIONS ASCRIBED TO THEM IN THE PLAN UNLESS OTHERWISE DEFINED HEREIN.**

**NO REPRESENTATION CONCERNING THE DEBTORS IS AUTHORIZED OTHER THAN AS SET FORTH HEREIN. ANY REPRESENTATIONS OR INDUCEMENTS MADE, WHICH ARE OTHER THAN AS CONTAINED HEREIN, SHOULD NOT BE RELIED UPON IN ARRIVING AT A DECISION ABOUT THE PLAN.**

**THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO AUDIT. FOR THAT REASON, AS WELL AS THE COMPLEXITY OF THE DEBTORS' BUSINESS AND FINANCIAL AFFAIRS, AND THE IMPOSSIBILITY OF MAKING ASSUMPTIONS, ESTIMATES, AND PROJECTIONS WITH COMPLETE ACCURACY, THE DEBTORS ARE UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT INACCURACY, ALTHOUGH EVERY REASONABLE EFFORT HAS BEEN MADE TO ENSURE THAT SUCH INFORMATION IS ACCURATE. THIS DISCLOSURE STATEMENT INCLUDES FORWARD LOOKING STATEMENTS BASED LARGELY ON THE DEBTORS' CURRENT EXPECTATIONS AND PROJECTIONS ABOUT FUTURE EVENTS AND FINANCIAL TRENDS AND ARE SUBJECT TO A NUMBER OF RISKS, UNCERTAINTIES, AND ASSUMPTIONS.**

**AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, CAUSES OF ACTION, AND OTHER ACTIONS, THE DISCLOSURE**

103669756.2

**STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS**.

Tempus International, Tempus Palms, Tempus Golf, Tempus Select, Backstage, Tempus Management, Tempus Realty, Tempus Marketing, and Time Retail are debtors under Chapter 11 of the Code in a jointly administered bankruptcy case pending in the United States Bankruptcy Court for the Middle District of Florida, Orlando Division (the "Bankruptcy Court").

As prescribed by the Code and the Rules, Claims asserted against, and Equity Interests in, the Debtors are placed into "Classes". The Plan designates (7) separate classes of Claims and Interests. The Plan contains one (1) Class of Unsecured Claims. The classification of Claims and the treatment of each Class are discussed in detail below.

To the extent the legal, contractual, or equitable rights with respect to any Claim or Interest asserted against the Debtors are altered, modified, or changed by treatment proposed under the Plan, such Claim or Interest is considered "Impaired" and the holder of such Claim or Interest is entitled to vote in favor of or against the Plan. A Ballot for voting in favor of or against the Plan (the "Ballot") will be mailed along with the order approving this Disclosure Statement.

**THE VOTE OF EACH CREDITOR OR INTEREST HOLDER WITH AN IMPAIRED CLAIM OR INTEREST IS IMPORTANT. TO BE COUNTED, YOUR BALLOT MUST BE RECEIVED AT THE ADDRESS AND BY THE DATE SET FORTH IN THE BALLOT.**

<div style="border:1px solid black;padding:10px;">

**VOTING DEADLINE**

The last day to vote to accept or reject the Plan is _____, 2011. All votes must be received by the Clerk of the United States Bankruptcy Court for the Middle District of Florida, 135 W. Central Boulevard, Suite 950, Orlando, FL 32801 by 5:00 p.m. (EST) on that day.

</div>

103669756.2

Upon receipt, the Ballots will be tabulated and the results of the voting will be presented to the Bankruptcy Court for its consideration. As described in greater detail in Section IV of this Disclosure Statement, the Code prescribes certain requirements for confirmation of a plan. The Bankruptcy Court will schedule a hearing (the "Confirmation Hearing") to consider whether the Debtors have complied with those requirements.

The Code permits a court to confirm a plan even if all Impaired Classes have not voted in favor of a plan. Confirmation of a plan over the objection of a Class is sometimes called "cramdown." As described in greater detail in Section IV of this Disclosure Statement, the Debtors have expressly reserved the right to seek "cramdown" in the event all Impaired Classes do not vote in favor of the Plan.

## II.   DESCRIPTION OF DEBTOR'S BUSINESS

### A.   In General.

Debtors are a full service Florida-based vacation ownership development, marketing, sales, and management company.  Formed in December 1997, the Debtors acquired their first resort property now known as Mystic Dunes Resort & Golf Club ("Mystic Dunes") in April 1998.  At the time, the project was in the beginning phases of development with only a sales center completed and two residential buildings under construction.  Over the past twelve years, the Debtors have built Mystic Dunes into one of the premier vacation ownership resorts in the world, with 717 one, two and three bedroom units in 23 residential buildings, a par 71 championship caliber golf course, a 20,000 square foot clubhouse and restaurant, and an array of amenities including a feature pool with rock slide, additional satellite pools, tennis courts, basketball courts, children's playground and an 18-hole miniature golf course.

In July 2000, Debtors entered into an exclusive long-term licensing agreement with Wyndham International, Inc. ("Wyndham") pursuant to which the Debtors became the

"official" vacation ownership company for Wyndham. Pursuant to the agreement ("Wyndham Agreement"), the Debtors were granted the exclusive right to develop, market and sell vacation ownership under the Wyndham brand and at existing Wyndham hotels. Over the next several years, the Debtors built their business plan around the Wyndham Agreement by focusing on the brand affiliation, opening sales centers at existing Wyndham hotels, and planning construction of a vacation ownership project at Wyndham's El Conquistador Resort in Puerto Rico. During this time, the Debtors' business expanded dramatically, with annual vacation ownership sales at Mystic Dunes exceeding $80 million dollars.

In order to finance this expansion, the Debtors entered into two loan facilities in 2004 with Residential Funding Corporation, a subsidiary of General Motors Acceptance Corporation. Residential Funding Corporation later assigned the loans to an affiliate, GMAC Commercial Finance, LLC (these entities are hereinafter collectively referred to as "GMAC"). The first loan, an acquisition and development loan, was to finance existing timeshare inventory as well as future construction of units and resort amenities. The second loan, a receivables loan, was to finance the Debtors' offering of purchase money financing to timeshare consumers. Prior to entering into its two loans with GMAC, the Debtors' previous financing provided for a maximum availability of $150 million dollars from a consortium of lenders. GMAC induced the Debtors to refinance with GMAC because GMAC did not require other lender participants, could provide a larger loan facility (up to $250 million dollars), and "would always be there."

In 2005, Wyndham was sold to an affiliate of the private equity firm, The Blackstone Group ("Blackstone"). Even though the term of the Wyndham Agreement still had fifteen years remaining, Blackstone advised the Debtors that it would not continue to honor it. Rather than going down a road of expensive and lengthy litigation to maintain a relationship with

an unwilling partner, after several months of negotiation, the Debtors agreed to accept a termination payment.

The termination of the Wyndham Agreement had negative impacts on the Debtors in multiple ways. In addition to having to give up the proposed El Conquistador project and the overall use and credibility of the Wyndham brand, the Debtors had to close their off-site sales centers at Wyndham hotels and lost access to the Wyndham customer base for marketing purposes. Rather than reducing overhead to adjust to the lower sales volume, however, GMAC encouraged the Debtors to maintain its platform because GMAC was interested in buying and growing the Debtors' business. Specifically, over the next several months, representatives of GMAC and the Debtors discussed a plan whereby GMAC would buy the Debtors' existing equity and then expand the Debtors' business by creating marketing efficiencies and synergies with GMAC's automobile financing and residential mortgage businesses. Communication between GMAC and the Debtors regarding the prospective acquisition slowed while GMAC representatives worked on finalizing the deal internally. During the first quarter of 2007, GMAC contacted Debtors and advised them that they would not be able to move forward with the acqusition, but would be able to continue their lending relationship. In the meantime, the Debtors began to explore new options for expanding the business while continuing to maintain their large operating platform.

In October 2007, the Debtors entered into an exclusive long-term marketing agreement with HRP Myrtle Beach Operations, LLC ("HRP"), the developer of a Hard Rock branded theme park ("Hard Rock Park") under construction in Myrtle Beach, South Carolina. Pursuant to the agreement with HRP ("HRP Agreement"), the Debtors would be the "official" vacation ownership company for Hard Rock Park when it opened and would have the exclusive right to market timeshare within Hard Rock Park. As part of the HRP Agreement, the parties

contemplated that after Hard Rock Park had opened and successfully operated for a while, the Debtors would purchase land adjacent to the park from HRP on which the Debtors would ultimately build a new vacation ownership project. In the meantime, however, in order to establish an immediate presence in Myrtle Beach and have a product to market when Hard Rock Park opened, the Debtors purchased twenty (20) units and created a vacation ownership plan at Dunes Village Resort ("Dunes Village"), a larger existing condominium hotel project on the north part of Myrtle Beach.

In early 2008 when the Debtors contacted GMAC about financing its prospective project at Hard Rock Park and subsequently the Dunes Village acquisition, the Debtors were advised that GMAC had suffered severe losses with its subprime residential mortgage business and would not be able to finance any new projects for the Debtors. GMAC further advised that in addition to not being able to purchase the Debtors as previously discussed, that GMAC was exiting the timeshare lending business completely and that the Debtors should start looking for new financing to replace GMAC.

The Debtors paid cash for their inventory at Dunes Village in June 2008, the same month that Hard Rock Park opened. Unfortunately, the timing of the opening and the decline in the economy contributed to Hard Rock Park underperforming and its eventual failure. Despite Hard Rock Park filing for bankruptcy relief the following September and ultimately liquidating, the Debtors were still able to secure timeshare inventory and receivables financing for the Dunes Village project from Textron Financial Corporation ("Textron").

B. Events Leading to Chapter 11 Filing.

The decline of the real estate market and overall economic recession affecting the United States has significantly impacted the vacation ownership and hospitality industries. The Debtors' portfolio of consumer mortgages experienced historically high default rates and the

volume of new timeshare sales has declined. GMAC suffered devastating losses and had to be "bailed out" by the U.S. government, while other lenders to the timeshare industry dramatically reduced their level of lending or joined GMAC by exiting the space entirely.

In April 2009, the Debtors' loans with GMAC could not be refinanced with another lender, so GMAC provided a one year extension, but materially increased its lending fees and interest rates, and imposed new restrictions on how the Debtors operated their business. As a result, the Debtors' marketing efforts were stifled and new sales further reduced. Fewer sales and continued higher default rates among the Debtors' customers caused a significant drop in the Debtors' cash availability under the GMAC Loans. The Debtors attempted to work with GMAC to ensure continued debt service and operations, but GMAC was unwilling to discuss the matter until defaults under the GMAC Loan actually occurred.

On January 8, 2010, even though the Debtors had still not committed any material default under the GMAC Loans, Debtor and GMAC entered into an agreement ("Amendment Agreement") that amended certain provisions of the Debtors' loans with GMAC. Among other modifications, the Amendment Agreement created a new working capital facility under the Debtors' receivables loan with GMAC; allowed for continued advances under the receivables loan with GMAC, but under amended and more restrictive terms; and provided for forbearance by GMAC with respect to certain specified defaults in the event they occurred. As part of the Amendment Agreement, the parties also agreed to cooperate in good faith to restructure or refinance the Debtors' loans with GMAC and/or sell the Debtors' business. The Amendment Agreement had an initial term of ninety (90) days, but was amended and extended for approximately seven (7) more months in successive two week increments.

As a result of the restrictions imposed by the Amendment Agreement regarding Debtors' use of the GMAC loan proceeds and cash flow from its related collateral, the Debtors

were forced to default under its Dunes Village loan from Textron and its other material secured loans to William R. Lambert and Lucille H. Lambert regarding undeveloped property adjacent to Mystic Dunes.

On or about February 1, 2010, GMAC, as part of the Amendment Agreement, required the Debtors to begin a sales process in order to sell some or all of Debtors' assets. The sales process was led by GMAC's investment banker/financial advisor, Houlihan Lokey Howard & Zukin Capital, Inc. ("Houlihan"). Houlihan solicited one hundred and forty-two (142) potential strategic and financial investors. Thirty-seven (37) executed confidentiality agreements and were provided access to a data room created by Houlihan with the assistance of the Debtors. The data room contained all of the financial and other information required for parties to conduct due diligence.

On May 7, 2010, Houlihan distributed a form asset purchase agreement ("APA") to eight (8) potential bidders. The APA was the result of extensive negotiations between GMAC and Debtors with input from Houlihan. By mid July, after an extensive and robust sales process, it was clear that the highest and best offer for the Debtors' assets was from Tempus Acquisition, LLC ("TAC"), an affiliate of Diamond Resorts Corporation, one of the largest timeshare companies in the world. During that time, GMAC, TAC and the Debtors began negotiating the final details of an APA. After several drafts of the APA had been traded among the parties, the Debtor was instructed by the managing director of GMAC, who was responsible for overseeing GMAC's portfolio of timeshare loans, to delay negotiations with TAC because GMAC was negotiating to sell its entire timeshare portfolio (inclusive of the Debtors' loans) ) and wanted to complete the APA after the entire portfolio was sold. The Debtors learned that this same individual and several other GMAC employees would be managing the portfolio for the buyer and that the TAC transaction would take place after the sale had closed.

103669756.2

In September 2010, GMAC completed the sale of its timeshare portfolio (including Debtors' loans) to Resort Finance America, LLC ("RFA"), an affiliate of the private equity firm Centerbridge Capital Partners L.P. As previously learned by the Debtors, several of the GMAC employees that were responsible for managing the portfolio for GMAC went to work for RFA or its affiliated asset management company, Lantern Asset Management, LLC ("Lantern"). The former Managing Director of GMAC who the Debtors dealt with on a regular basis throughout the workout with GMAC is now a principal and executive officer of RFA/Lantern.

After its acquisition of the GMAC portfolio, RFA refused to extend or restructure the Debtors' loans and demanded that Debtors file for bankruptcy under Chapter 11 of the Bankruptcy Code. Throughout the discussions on how any bankruptcy filing would proceed, representatives of RFA made it clear that it wanted the Debtors to seek a quick sale of its assets in a Chapter 11 Bankruptcy, whereby RFA could obtain ownership of the Debtors' assets through a credit bid. RFA's representatives indicated that they believed they could make a profit above the amount actually owed under the GMAC Loans by acquiring Debtors' assets for themselves and hiring an existing timeshare company to operate them on a fee-for-service basis. Unwilling to give in to RFA's demands and with funding no longer available under the GMAC Loans, the Debtors had no choice but to file for protection under Chapter 11 of the Bankruptcy Code on November 19, 2010.

C.    Events Subsequent to Chapter 11 Filing.

Since the Petition Date, the Debtors have been continuing to operate their business as debtors-in-possession under Sections 1101(a) and 1108 of the Code. Pursuant to various provisions of the Code, Debtors have sought and obtained several orders from the Bankruptcy Court intended to facilitate the ongoing operations of the Debtors. Those orders

authorized the Debtors to, among other things: (i) obtain credit and incur debt; (ii) use cash collateral subject to secured liens; and (iii) pay prepetition wages.

The most significant of the Debtors first day motions is the Debtors' Motion to Obtain Credit and Incur Debt (the "DIP Motion") (Doc. No. 5). The DIP Motion seeks approval for the Debtors to incur necessary debt from Tempus Acquisition, LLC in order to sustain operations through confirmation of the Debtors' Plan of Reorganization. The Court has granted the DIP Motion on a preliminary basis through February 9, 2011.

Additionally, the Debtors have filed two separate adversary proceedings against RFA in connection with actions taken within the ninety (90) days prior to the Petition Date. The first adversary proceeding styled *Tempus Resorts Management, Ltd. v. GMAC Commercial Finance, LLC, et al.* (Adv. Pro. 6:10-ap-00315-KSJ) ("RFA Preference Lawsuit") seeks to avoid as preference RFA's perfection of its lien on Tempus Management's exclusive management agreement to manage the Debtors' Mystic Dunes Resort. The second adversary proceeding styled *Tempus Palms International, Ltd. v. Resort Finance America, LLC* (Adv. Pro.6:10-ap-00314-KSJ) ("RFA Fraudulent Transfer Lawsuit") seeks to avoid the Debtors' conveyance of certain notes receivable to RFA less than two weeks prior to the Petition Date as a constructive fraudulent transfer because the Debtors received no consideration for the transfer. While the Debtors caution that there is no guarantee that the adversary proceedings will be successful, the Debtors believe that both adversary proceedings are meritorious and anticipate obtaining a judgment against RFA in both adversary proceedings.

## III.   THE PLAN

THE FOLLOWING SUMMARY IS INTENDED ONLY TO PROVIDE AN OVERVIEW OF THE DEBTORS' PLAN. ANY PARTY IN INTEREST CONSIDERING A VOTE ON THE PLAN SHOULD CAREFULLY READ THE PLAN IN ITS ENTIRETY

**BEFORE MAKING A DETERMINATION TO VOTE IN FAVOR OF OR AGAINST THE PLAN. THIS SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN.**

    A.    <u>Overview.</u>

Overall, the Plan contemplates the reorganization of the Debtors by a combination of payments and a return of collateral to RFA, payments to its other secured creditors over time, and payment to unsecured creditors from the proceeds of the RFA Fraudulent Transfer Lawsuit. The Plan provides that holders of Allowed Administrative Claims will be paid in full on the Effective Date from the Debtors cash on hand. Holders of Allowed Priority Claims, to the extent any such claims exist, will be paid over a period of five (5) years from the Petition Date with interest. Existing equity in the Debtors will be cancelled, the Debtors will be substantively consolidated into a Reorganized Debtor, and the TAC DIP Loan obligations will be converted into new equity in the Reorganized Debtor.

All Claims against the Debtors shall be classified and treated pursuant to the terms of the Plan. As noted more fully below, the Plan contains seven (7) Classes of Claims and Interests. There are five (5) Classes of Secured Claims, one (1) Class of Unsecured Claims, and one (1) Class of Interests.

    B.    <u>Classification and Treatment of Claims.</u>

        1.    <u>Priority Claims.</u>

            a.    <u>Administrative Expense Claims.</u>

Holders of all Allowed Administrative Expense Claims of the Debtor shall be paid in full on the Effective Date or in accordance with existing credit or repayment terms. Debtors' cash-on-hand, as of the Effective Date, shall be used to pay Allowed Administrative Expense Claims.

103669756.2

b.  Priority Tax Claims.

Except to the extent that the Holder and the Reorganized Debtor have agreed or may agree to a different treatment, each Holder of an Allowed Priority Tax Claim shall receive from the Reorganized Debtor, in full satisfaction of such Claim, payments equal to the Allowed Amount of such Claim. Allowed Priority Tax Claims will be paid over a period of five years from the Petition Date with interest at five percent (5%); the payments will be made quarterly. Payments will commence on the later of the first day of the first full quarter following the Effective Date or on the first day of the first full quarter following the date that the respective Priority Claim becomes an Allowed Claim. To the extent a Holder of an Allowed Priority Tax Claim holds lien rights, such Holder will retain those rights, but may not enforce such rights if the Reorganized Debtor is making payments to such Holder in accordance with the Plan.

2.  Secured Claims.

a.  Class 1 — TAC (DIP Loan Obligations).

Class 1 consists of the Allowed Secured Claim of TAC in connection with that Post Petition Term Credit and Security Agreement dated November 23, 2010 by and between TAC and the Debtors (the "DIP Loan"). The DIP Loan is estimated in the amount of $6,500,000 and is secured by a second priority lien on all of the Debtors' assets and a first priority lien on any assets not already encumbered ("DIP Loan Collateral").

In full and final satisfaction of TAC's Allowed Class 1 Secured Claim, on the Effective Date, all existing obligations under the DIP Loan shall be converted to new equity in the Reorganized Debtor. The Class 1 Claim of TAC is impaired and, as such, TAC is entitled to vote on the Plan.

b.  Class 2 — RFA (Acquisition and Development Loan Obligations).

103669756.2

Class 2 consists of the Allowed Secured Claim of Resort Finance America, LLC ("RFA") in connection with that certain Loan Agreement and Promissory Note by and between GMAC and the Debtors dated October 28, 2004, which was subsequently assigned to RFA (the "RFA Development Loan"). The Allowed Secured Claim is estimated in the amount of $17,081,898.38 and is secured by a first priority lien on the Debtors' inventory of unsold timeshare intervals, golf course, and other resort-related improvements and property located at the Debtors' Mystic Dunes Resort & Golf Club ("RFA Development Collateral").

In full satisfaction of RFA's Allowed Class 2 Secured Claim, on the Effective Date, the Reorganized Debtors shall pay RFA in cash the full amount of the Allowed Class 2 Secured Claim. The Class 2 Claim of RFA is not impaired and, as such, RFA is not entitled to vote on the Plan.

        c.        <u>Class 3 — RFA (Receivables Loan Obligations).</u>

Class 3 consists of the Allowed Secured Claim of RFA in connection with that certain Loan Agreement and Promissory Note by and between GMAC and the Debtors dated October 24, 2008 (the "RFA Receivables Loan"). The Allowed Secured Claim is estimated in the amount of $96,298,435.45 and is secured by a first priority lien on most of the notes receivable generated by Tempus International at the Mystic Dunes Resort ("Pledged RFA Receivables").

In full satisfaction of RFA's Allowed Class 3 Secured Claim, on the Effective Date, the Debtors shall transfer the Pledged RFA Receivables to RFA or its designee free and clear of all liens, claims, and encumbrances as the indubitable equivalent of its Allowed Class 3 Claim. The Class 3 Claim of RFA is impaired and, as such, RFA is entitled to vote on the Plan.

        d.        <u>Class 4 — Textron (Receivables and Inventory Loan Obligations).</u>

Class 4 consists of the Allowed Secured Claim of Textron Financial Corporation ("Textron") in connection with that certain Receivables and Inventory Loan and Security Agreement dated November 5, 2008 by and between Textron and Backstage (the "Textron Inventory and Receivables Loan"). The Allowed Secured Claim is estimated in the amount of $5,662,306.00 and is secured by a first priority lien on Backstage's inventory of unsold timeshare intervals ("Textron Inventory Collateral") and all notes receivables generated by Backstage's Dunes Village Resort ("Textron Receivables Collateral").

In full satisfaction of Textron's Allowed Class 4 Secured Claim, on the Effective Date, the Reorganized Debtor shall transfer the Textron Receivables Collateral to Textron or its designee free and clear of all liens, claims, and encumbrances. Additionally, Textron shall retain its mortgages and liens on the Textron Inventory Collateral and be paid the full amount of its Allowed Secured Claim over time with interest as provided in that certain letter agreement dated December 22, 2010 by and between Textron and TAC and attached hereto as **Exhibit "A"**.

e.  <u>Class 5 — Lambert (Undeveloped Land Obligations).</u>

Class 5 consists of the Allowed Secured Claim of William R. Lambert and Lucille H. Lambert, and William R. Lambert Trustee (collectively, "Lambert") in connection with an acquisition loan for undeveloped parcels H-2, J-1, J-2, J-3, E, F, D, G-2, I-2, I-2a, I-2b, I-2c, and I-2d located at 7900 Mystic Dunes Lane, Celebration, FL 34747 (the "Lambert Acquisition Loan"). The Allowed Secured Claim is estimated in the amount of $5,757,979.00 plus accrued interest and is secured by a first mortgage on undeveloped parcels H-2, J-1, J-2, J-3, E, F, D, G-2, I-2, I-2a, I-2b, I-2c, and I-2d located at 7900 Mystic Dunes Lane, Celebration, FL 34747 ("Undeveloped Land").

In full satisfaction of Lambert's Allowed Class 5 Secured Claim,

on the Effective Date, Reorganized Debtors shall transfer the Undeveloped Land back to Lambert free and clear of all liens, claims, and encumbrances as the indubitable equivalent of Lambert's Allowed Class 5 Claim. Additionally, on the Effective Date, Lambert shall execute a one year renewable option contract with the Reorganized Debtor to sell the Undeveloped Land back to Reorganized Debtor at a price and with terms to be agreed upon by the parties ("Lambert Option Contract"). Lambert and Reorganized Debtor shall mutually agree to the cash consideration to be paid by Reorganized Debtor for the Lambert Option Contract. The Class 5 Claim of Lambert is impaired and, as such, Lambert is entitled to vote on the Plan.

   3. <u>Unsecured Claims.</u>

    a. <u>Class 6 – Unsecured Creditors</u>

    Class 6 consists of the collective holders of Allowed Unsecured Claims against the Debtors. In full and final satisfaction of each Allowed Unsecured Claim, each Holder of an Allowed Unsecured Claim shall be entitled to a pro rata share of the proceeds of the RFA Fraudulent Transfer Lawsuit. While recovery of any lawsuit is speculative, the Debtors estimate the total value of the RFA Fraudulent Transfer Lawsuit is $840,000. The Class 6 Claims of Unsecured Creditors are impaired and, as such, holders of Allowed Unsecured Claims are entitled to vote on the Plan.

   4. <u>Equity Interests.</u>

    a. <u>Class 7 – Equity Interests</u>

    Class 7 consists of the collective Interests in the Debtors. The Debtors' Interest will be cancelled on the Effective Date of the Plan. Because the Class 7 Interests are being cancelled, they are deemed to reject the Plan and, as such, Holders of Allowed Interests in the Debtors are not entitled to vote on the Plan.

103669756.2

C.     Means of Implementation.

    1.     Prosecution of the RFA Fraudulent Transfer Lawsuit.

The Plan provides that Holders of Allowed Unsecured Claims will be entitled to a pro rata share of any proceeds from the RFA Fraudulent Transfer Lawsuit.  The Debtors have filed and are currently prosecuting the RFA Fraudulent Transfer Lawsuit.  In the event an Official Committee of Unsecured Creditors is appointed and retains counsel in these jointly administered cases, such counsel will substitute in and continue prosecuting the RFA Fraudulent Transfer lawsuit for the benefit of Holders of Allowed Unsecured Claims.  In the event no committee is formed or such committee does not retain counsel, counsel for the Reorganized Debtor will prosecute the RFA Fraudulent Transfer Lawsuit.

    2.     Business Operations and Cash Flow.

The Debtors will continue to operate their business after confirmation of the Plan. Debtors believe cash flow from the continued operation of their business will be sufficient to meet all required Plan Payments.

    3.     Funds Generated During Chapter 11 Business Operations and Cash Flow.

Funds generated from operations until the Effective Date  will be used for operational expenses and Plan Payments; provided, however, to the extent such funds constitute RFA's collateral, such funds will not be used without RFA's consent or approval by the Court.

    4.     Substantive Consolidation of the Debtors.

The Plan contemplates substantive consolidation of the Debtors to form the Reorganized Debtor.  The Debtors believe that substantive consolidation of the Debtors will not prejudice any of the Debtors' creditors and will simplify the Debtors' accounting and obligations under the Plan.

103669756.2

5.     <u>Management and Control of the Debtors Post-Confirmation.</u>

a.     <u>General Partner.</u> Post confirmation, the operations of the Reorganized Debtor shall be overseen by its General Partner. The General Partner shall have all corporate authority vested in general partners under the applicable laws of the State of Florida including the power to appoint and terminate officers and to liquidate the Debtors and to wind up their affairs, with all such powers to be exercised by a majority vote.

The initial General Partner shall be TAC and TAC shall continue to serve until either: (i) the Debtors cease to do business; or (ii) TAC resigns or is replaced in accordance with Florida law.

b.     <u>Officers.</u>

David F. Palmer shall be the President of the Reorganized Debtor and shall remain in that capacity until replaced by TAC. It has not yet been determined whether Mr. Palmer will earn a salary in connection with his employment with the Reorganized Debtor. In the event it is determined that Mr. Palmer will earn a salary in connection with his employment with Reorganized Debtor, the Debtors will provide notice of such salary within fourteen days prior to the Confirmation Hearing. Additionally, it is contemplated that several members of the Debtors' current executive team will be employed with the Reorganized Debtor. The Debtors will provide notice of the terms of such employment no later than fourteen days prior to the Confirmation Hearing.

c.     <u>Equity in the Reorganized Debtor After Confirmation.</u>

After Confirmation, all equity interest in the Reorganized Debtor shall be vested in TAC in full satisfaction of the DIP Loan obligations.

D.     <u>Other Provisions.</u>

To the extent the Debtors reject any executory contract or unexpired lease prior to

the Confirmation Date, any party asserting a Claim, pursuant to Section 365 of the Code, arising from the rejection of an executory contract or lease shall file a proof of such Claim within thirty (30) days after the entry of an Order rejecting such contract or lease, and any Allowed Claim resulting from rejection shall be a Class 6 Claim. The Debtors shall have through and including the hearing on Confirmation within which to assume or reject any unexpired lease or executory contract; and, further, that in the event any such unexpired lease or executory contract is not assumed (or subject to a pending motion to assume) by such date, then such unexpired lease or executory contract shall be deemed rejected as of the Confirmation Date. The Plan also provides for the Bankruptcy Court to retain jurisdiction as to certain matters as stated in the Plan, including, without limitation, prosecution of all causes of action and objection to Claims.

## IV. <u>CONFIRMATION</u>

A. <u>Confirmation Hearing.</u>

Section 1128 of the Code requires the Court, after notice, hold a Confirmation Hearing on the Plan at which time any party in interest may be heard in support of or in opposition to Confirmation. The Confirmation Hearing may be adjourned from time to time without further notice except for an announcement to be made at the Confirmation Hearing. Any objection to Confirmation must be made in writing and filed with the Clerk, and delivered to the following persons, at least seven (7) days prior to Confirmation Hearing:

Counsel for Debtors:

Jimmy D. Parrish, Esquire
Elizabeth Green, Esquire
Baker & Hostetler LLP
200 S. Orange Ave.
SunTrust Center, Suite 2300
Orlando, FL  32801-3432

103669756.2

Tempus Resorts International Ltd., et al.:

Roger Farwell, Prseident and CEO
7380 Sand Lake Road, Suite 600
Orlando, FL 32819

United States Trustee:

Attn: Elena Escamilla, Esquire
135 W. Central Blvd., Suite 620
Orlando, FL 32801

B.   Financial Information Relevant to Confirmation[1]

C.   Confirmation Standards.

For a plan of reorganization to be confirmed the Code requires, among other things, that a plan be proposed in good faith and comply with the applicable provisions of Chapter 11 of the Code. Section 1129 of the Code also imposes requirements that at least one class of Impaired Claims accept a plan, that confirmation of a plan is not likely to be followed by the need for further financial reorganization, that a plan be in the best interests of creditors, and that a plan be fair and equitable with respect to each class of Claims or Interests which is Impaired under the plan.

The Bankruptcy Court shall confirm a plan only if it finds that all of the requirements enumerated in Section 1129 of the Code have been met. The Debtors believe that the Plan satisfies all of the requirements for Confirmation.

1.   Best Interests Test.

Before the Plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the Plan provides, with respect to each Class, that each holder of an

---

[1] The Debtors anticipate the preparation of: (i) a liquidation analysis demonstrating that creditors of the Debtors will fair materially poorer in the event the Debtors are forced into a Chapter 7 as compared to the Plan; and (ii) a pro forma that demonstrates the feasibility of their plan of reorganization. Neither document has been completed at this time, however, the Debtors will file both a liquidation analysis and a pro forma no later than fourteen days prior to the hearing on Confirmation of the Debtors' Plan of Reorganization.

Allowed Claim or Interest of such Class either: (a) has accepted the Plan; or (b) will receive or retain under the Plan, on account of such Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount that such holder would receive or retain if the Debtors were, on the Effective Date, liquidated under Chapter 7 of the Code. The Debtors believe the best interest test and the liquidation test will be met.

2.     <u>Financial Feasibility.</u>

The Code requires, as a condition to Confirmation, that Confirmation of a plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless the liquidation is proposed in the Plan. The Debtors assert that the Plan is feasible and believe that they will be able to prove such at a hearing on Confirmation of the Debtors' Plan of Reorganization.

3.     <u>Acceptance by Impaired Classes.</u>

The Code requires as a condition to Confirmation that each Class of Claims or Interests that is Impaired under the Plan accept such plan, with the exception described in the following section. A Class of Claims has accepted the Plan if the Plan has been accepted by Creditors that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class who vote to accept or to reject the Plan.

A Class of Interests has accepted the Plan if the Plan has been accepted by holders of Interests that hold at least two-thirds (2/3) in amount of the Allowed Interests of such Class that vote to accept or reject the Plan. Holders of Claims or Interests who fail to vote are not counted as either accepting or rejecting the Plan.

A Class that is not Impaired under a Plan is deemed to have accepted such Plan; solicitation of acceptances with respect to such Class is not required. A Class is Impaired unless: (i) the legal, equitable, and contractual rights to which the Claim or Interest entitles the

22

holder of such Claim or Interest are not modified; (ii) with respect to Secured Claims, the effect

of any default is cured and the original terms of the obligation are reinstated; or (iii) the Plan

provides that on the Effective Date the holder of the Claim or Interest receives on account of

such claim or interest, Cash equal to the Allowed Amount of such Claim or, with respect to any

Interest, any fixed liquidation preference to which the holder is entitled.

4.      Confirmation Without Acceptance by all Impaired Classes; "Cramdown."

The Code contains provisions that enable the Court to confirm the Plan,

even though all Impaired Classes have not accepted the Plan, provided that the Plan has been

accepted by at least one Impaired Class of Claims Section 1129(b)(1) of the Code states:

> "Notwithstanding section 510(a) of this title, if all of the applicable
> requirements of subsection (a) of this section other than paragraph (8) are
> met with respect to a plan, the court, on request of the proponent of the
> plan, shall confirm the plan notwithstanding the requirements of such
> paragraph if the plan does not discriminate unfairly, and is fair and
> equitable, with respect to each class of claims or interests that is impaired
> under, and has not accepted, the plan."

This section makes clear that the Plan may be confirmed, notwithstanding

the failure of an Impaired Class to accept the Plan, so long as the Plan does not discriminate

unfairly and it is fair and equitable with respect to each Class of Claims that is Impaired under

and has not accepted the Plan.

**THE DEBTORS BELIEVE THAT, IF NECESSARY, THEY WILL BE
ABLE TO MEET THE STATUTORY STANDARDS SET FORTH IN THE
CODE WITH RESPECT TO NONCONSENSUAL CONFIRMATION OF
THE PLAN AND WILL SEEK SUCH RELIEF.**

D.      Consummation.

The Plan will be consummated and Payments made if the Plan is Confirmed

pursuant to a Final Order of the Court and distributions under the Plan commence. It will not be

necessary for the Debtors to await any required regulatory approvals from agencies or

103669756.2

departments of the United States to consummate the Plan. The Plan will be implemented pursuant to its provisions and the Code.

E.     Effects of Confirmation.

    1.     Authority to Effectuate the Plan

Upon the entry of the Confirmation Order by the Bankruptcy Court, the Plan provides all matters provided under the Plan will be deemed to be authorized and approved without further approval from the Bankruptcy Court. The Debtors shall be authorized, without further application for an order of the Bankruptcy Court, to take whatever action is necessary to achieve consummation and carry out the Plan in accordance with this Plan and the Code.

    2.     Binding Effect of Confirmation

Confirmation of the Plan will legally bind the Debtors, all Creditors, Interest Holders, and other Parties in Interest to the provisions of the Plan whether or not the Claim or Interest Holder is impaired under the Plan and whether or not such Creditor or Interest Holder voted to accept the Plan.

    3.     Discharge of Claims

To the fullest extent permitted by applicable law, and except as otherwise provided in the Plan, the operative documents implementing the Plan, or the Confirmation Order: (a) on the Effective Date the Confirmation Order shall operate as a discharge under 11 U.S.C. §1140(d)(1) of the Bankruptcy Code, and as a release of any and all Claims, Debts, Liens, Security Interests, and encumbrances of and against the Debtors, the Reorganized Debtor and all Property that arose before Confirmation, including without limitation, any Claim of a kind specified in §§ 502(g), 502(h), or 502(i) of the Bankruptcy Code, and all principal and interest, whether accrued before, on, or after the Petition Date, regardless of whether (i) a Proof of Claim has been filed or deemed filed, (ii) such Claim has been Allowed pursuant to §502 of the

24

Bankruptcy Code, or (iii) the Holder of such Claim has voted on the Plan or has voted to reject the Plan; and (b) from and after the Effective Date (i) all Holders of Claims shall be barred and enjoined from asserting against the Debtors, the Reorganized Debtor, and its property any Claims, Debts, Liens, Security Interests, and encumbrances of and against all Property of the Estate, and (iii) the Debtors and the Reorganized Debtor shall be fully and finally discharged of any liability or obligation on a Disallowed Claim or an Interest. Except as otherwise specifically provided herein, nothing in the Plan shall be deemed to waive, limit, or restrict in any manner the discharge granted upon Confirmation of the Plan pursuant to §1141 of the Bankruptcy Code.

4.      Judicial Determination of Discharge

As of the Confirmation Date, except as provided in the Plan, all Persons shall be precluded from asserting against the Debtors or the Reorganized Debtor any other or further Claims, debts, rights, causes of action, liabilities, or equity interests based on any act, omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date and the Confirmation Order shall be a judicial determination of discharge of all Claims against the Debtors and Reorganized Debtor, pursuant to Sections 524 and 1141 of the Bankruptcy Code, and shall void any judgment obtained or entered against the Debtors or the Reorganized Debtor at any time to the extent the judgment relates to discharged Claims.

5.      Injunction

As part of the Confirmation Order, the Bankruptcy Court shall permanently enjoin and prohibit all Holders of Claims, Liens, Security Interests, Liens, encumbrances rights and Interest in, to or against the Debtors, the Reorganized Debtor, or any of its assets from asserting, prosecuting or collecting such Claims, Liens, Security Interests (other than Liens or Security Interests expressly continued pursuant to the terms of the Plan or the operative documents between the Debtors, the Reorganized Debtor, and the Holder of a Claim

regarding the treatment of the Claim under the Plan), encumbrances, rights and Interests against the Debtors provided, however, that such injunction shall not apply to any Claim asserted against the Reorganized Debtor by a claimant based upon a default by the Reorganized Debtor in performance of its obligations to the claimant under the Plan.

      6.    <u>Post-Confirmation Status Report</u>

Pursuant to the Plan, within 120 days of the entry of the Confirmation Order, the Reorganized Debtor will file status reports with the Bankruptcy Court explaining what progress has been made toward consummation of the confirmed Plan. The status report will be served on the United States Trustee and those parties who have requested special notice post-confirmation. The Bankruptcy Court may schedule subsequent status conferences in its discretion.

## V.    **<u>ALTERNATIVE TO THE PLAN.</u>**

If the Plan is not confirmed and consummated, the Debtors believe that the most likely alternative is a sale of the Debtors or a liquidation of the Debtors under Chapter 7 of the Code or a sale of the Debtors assets and credit bid by RFA. The Debtors believe that either alternative is a much less attractive alternative to Creditors because of the increased administrative expenses with no return to other Creditors other than RFA.

103669756.2

## VI.     <u>CONCLUSION.</u>

The Debtors recommend that holders of Claims vote to accept the Plan.

DATED this 31st day of December 2010, in Orlando, Florida.

<div align="right">

/s/ Jimmy D. Parrish
_____
Jimmy D. Parrish, Esquire
Florida Bar No. 526401
BAKER & HOSTETLER, LLP
200 S. Orange Avenue
SunTrust Center, Suite 2300
Orlando, Florida 32801
Tel: (407)649-4000
Fax: (407)841-0168
Attorneys for the Debtors

</div>

103669756.2

**Tempus Acquisition, LLC**
10600 West Charleston Boulevard
Las Vegas, Nevada 89135


December 22, 2010

Textron Financial Corporation
45 Glastonbury Boulevard
Glastonbury, CT 06033
Attn: Kyle Shonak

Re:      Proposed Loan from Textron Financial Corporation ("**Lender**") to **Tempus Acquisition, LLC** ("**Sponsor**")

Ladies and Gentlemen:

The following summary of proposed terms ("**Proposal**") is delivered to you in connection with Sponsor's submittal to Tempus Resorts International, Ltd. ("**TRI**") of a bid for purchase of certain assets of TRI and its affiliates. The closing of any transaction between Sponsor and Lender will be subject to (i) the negotiation and execution of definitive documents generally consistent with the Proposal, in form and substance acceptable to Sponsor in its sole discretion, and (ii) the simultaneous closing of the Transaction (defined below) on terms and conditions acceptable to Sponsor in its sole discretion.

Following is a summary of the material terms on which Sponsor proposes to obtain financing from Lender to restructure the existing financing relating to the Dunes Village Resort in Myrtle Beach, South Carolina existing between Lender and Tempus Resorts International, Ltd. and its affiliates (individually or collectively, "**Debtor**") to be paid at the effective date of a confirmation of the Debtor's chapter 11 plan of reorganization that includes an equity investment by Sponsor (such transaction is the "**Transaction**").

1.     <u>Loan Amount</u>: 100% of the Inventory Price (as calculated based on the formula set forth on <u>Exhibit A</u> of this letter) of the unsold timeshare inventory (the "**Inventory**") (the foregoing is the "**Loan**").

2.     <u>Collateral</u>:     The Loan shall be secured by a mortgage on the Inventory, which mortgage shall be partially released at each such time as the equivalent of a "Unit Week" (as defined in the Declaration of Condominium for the Resort) is sold by Sponsor.

3.     <u>Interest Rate</u>:     LIBOR (with a floor of 2%) + 5.5%. Interest will accrue and be paid in arrears on a quarterly basis during the term of the Loan.

4.     <u>Term</u>:     Five years, with two one-year extension options, which options may be exercised by Sponsor upon 60 days prior written notice to Lender so long as no event of default has occurred under the Loan. The extension fee payable in the event that the Sponsor exercises the annual extension options is $200,000.

5.     <u>Mandatory Prepayment</u>: It is Sponsor's intention that "Diamond Club Points" shall be marketed for sale by an affiliate of Sponsor through the sales center located at the Mystic Dunes Resort and Golf Club (the "**Resort**") in Orlando, Florida (the "**Sales Center**"). On a monthly basis, (i) all Diamond Club Points sold through the Sales Center and with respect to which any and all rescission rights of the

purchasers have expired, shall be converted to the equivalent number of Fractional Interests (the "**Points Equivalent Weeks**") based on a conversion formula to be approved by Lender prior to closing, (ii) Diamond Resorts Corporation or an affiliate thereof will purchase from Sponsor the Points Equivalent Weeks at the purchase price set forth therefor in a transfer pricing agreement to be entered into prior to closing, and (iii) Sponsor shall pay to Lender proceeds equal to the number of Dunes Village Points Equivalent Weeks times $4,800 (such amount is the "**Release Fee**"), which Release Fee shall be applied by Lender to reduce the outstanding principal balance of the Loan. For purposes hereof, "**Dunes Village Points Equivalent Weeks**" is the number of Points Equivalent Weeks for such month times a ratio, the numerator of which is the number of Fractional Interests associated with the Resort purchased by Sponsor at the closing of the Transaction over the total number of Fractional Interests and Unit Weeks purchased by Sponsor at the closing of the Transaction. Upon receipt of a Release Fee, Lender shall issue a partial release of the mortgage encumbering the Inventory to release from the lien thereof the applicable Points Equivalent Weeks.

6.      Voluntary Prepayment: The Loan shall be open to prepayment, in whole or in part, at any time during the term without penalty.

7.      Recourse:              The Loan shall be non-recourse to the Sponsor. Repayment of the Loan shall be secured solely by Lender's line on the collateral, and no guarantees from any affiliates of Sponsor shall be required.

8.      Cross Default:  The Loan shall not be cross-collateralized or cross-defaulted with any other debt of Sponsor or any of its affiliates.

9.      Servicing Agreement:   Simultaneous with the closing of the Transaction and the closing of the Loan, Lender or its affiliate shall enter into a Servicing Agreement with an affiliate of Sponsor, Lender, and Diamond Resorts Financial Services, Inc. ("**Servicer**"), pursuant to which Servicer shall service the Timeshare Receivables (as defined in Exhibit A) described therein in exchange for a 2% servicing fee and such other usual and customary fees as may be more particularly set forth therein. The Servicing Agreement shall further provide for a remarketing agreement with terms agreeable to both the Sponsor and Lender.

10.     Transfers:              Sponsor shall be permitted to transfer all or any portion of its interest in the collateral for the Loan to any of its affiliates without the necessity of consent from Lender.


Sincerely,


_____

David Palmer, President
Tempus Acquisition, LLC


AGREEED:

_____
Kyle Shonak
Textron Financial Corporation


103670629.1

<u>**Exhibit A**</u>

<u>Purchase Price</u>

<u>Inventory</u>

The inventory price for the Inventory is equal to the sum of all Unit Week Purchase Prices.

"**Unit Week Purchase Price**" means, for each Fractional Interest (as defined in the Dunes Village Declaration) constituting a portion of the Timeshare Interests being acquired by Sponsor, the purchase price set forth below, as determined based on unit type (i.e., studio, one bedroom, two bedroom, etc.).

| Unit Type | Hard Inventory per Unit Price |
|---|---|
| Studio | $2,800 |
| One Bedroom | $3,300 |
| Two Bedroom | $3,800 |
| Three Bedroom | $5,800 |
| Four Bedroom | $6,800 |

"**Hard Inventory**" refers to those Fractional Interests which are owned in fee simple by Debtor and are available for immediate sale to a third party purchaser.

"**Timeshare Receivable**" means the debt obligation of a person or entity to Debtor or its successor in interest with respect to the purchase of a timeshare interest which was financed by Debtor, together with all related promissory notes, mortgages, other security documents and agreements, instruments and documents evidencing or governing such debt obligation.